PEOPLE v McINTIRE

Docket Nos. 194301, 194362. Submitted October 15, 1997, at Lansing. Decided October 9, 1998, at 9:00 A.M. Leave to appeal sought.

Charles R. McIntire was summoned to testify as a witness on January 26, 1983, during a one-man grand jury inquiry conducted in the Montmorency Circuit Court concerning a homicide that occurred in the county in December 1982. After McIntire asserted his right against self-incrimination, the judge granted a motion by the prosecutor and entered an order, pursuant to MCL 767.6; MSA 28.946, that granted McIntire complete immunity from any charges that would arise from the homicide. McIntire then testified. After the inquiry, the murder remained unsolved. In 1984, McIntire moved to South Carolina with his family. In 1994, Tom Fleck, who, together with McIntire, had been suspected of being involved in the homicide, implicated himself and McIntire. Complaints were filed in the Montmorency Circuit Court in August 1994, accusing McIntire of open murder and possession of a firearm during the commission of a felony, and, in a separate case, perjury committed in court, based on McIntire's grand jury testimony. Warrants were issued and McIntire was returned to Michigan in late 1994 or early 1995. A determination of McIntire's motion to dismiss the murder and felony-firearm charges was postponed while the perjury trial proceeded. Following a jury trial, McIntire was convicted of four counts of perjury and sentenced to concurrent sentences of ten to fifteen years, Joseph P. Swallow, J. The court then granted McIntire's motion to dismiss the murder and felony-firearm charges on the basis that McIntire had been granted immunity that was not voided by his perjured testimony. The prosecution appealed from that order (Docket No. 194301). McIntire appealed from his perjury convictions and sentences (Docket No. 194362). The appeals were consolidated.

The Court of Appeals held:

1. The immunity agreement is void, and McIntire is not entitled to claim the benefits of the grant of full transactional immunity under MCL 767.6; MSA 28.946. The reference in the statute to a witness' obligation to provide an "answer," in exchange for immunity, cannot reasonably be interpreted to mean any utterance of words

in reply, but refers to a truthful answer. The immunity need not be recognized unless every condition of the statute has been honored by the immunized witness. Where a witness does not give truthful answers during immunized testimony, the witness does not comply with the statute and does not receive immunity. McIntire did not comply with the statute when he provided materially false testimony. Thus, his testimony did not suffice to confer transactional immunity under the statute, and he can be charged and tried for murder and felony-firearm. The order dismissing those charges must be reversed and the matter must be remanded for the reinstatement of the charges.

2. Holding MCL 767.6; MSA 28.946 to grant immunity in the face of materially false testimony would thwart the purpose of the statute, which is the discovery of crime, would undermine its reasonably implied condition of truthfulness, and would render illusory a bargain struck between the prosecutor and a criminal witness regarding a matter of the highest importance to the security and tranquillity of the people. A requirement of truthful testimony is compelled by the language of the statute when viewed in its obvious context.

3. The defendant did not sustain his burden of showing that he was prejudiced by the delay in his perjury case. Even assuming that the defendant suffered some prejudice by the delay, no due process violation occurred because the prosecution satisfied its burden of establishing that the reasons for the delay were sufficient to justify the resulting prejudice.

4. The court properly found that the nonresident tolling provision of the applicable statute of limitations, MCL 767.24(1); MSA 28.964(1), tolled the running of the six-year period of limitation applicable to the perjury charges during the period that McIntire did not usually and publicly reside in Michigan after July 1984.

5. The court properly limited the cross-examination of witness Tom Fleck to exclude evidence of what occurred during the plea negotiations that preceded Fleck's acceptance of an offer to plead guilty of being an accessory after the fact to murder. McIntire's rights to confrontation and due process were not violated.

6. Even if the court erred in refusing to allow McIntire to impeach witness Arthur Baker, a former sheriff's department detective who had investigated the murder, with evidence of Baker's alleged bias or prejudice, any denial of McIntire's constitutional rights was harmless beyond a reasonable doubt because two other police officers gave testimony similar to Baker's.

7. The court did not engage in judicial misconduct.

8. The court did not err in allowing testimony by certain rebuttal witnesses and in denying McIntire the opportunity to present certain surrebuttal testimony.

9. Even if the instructions regarding perjury were imperfect, no error occurred because the instructions fairly presented the issues to be tried and sufficiently protected McIntire's rights.

10. The sentences for the perjury convictions are proportional. The court did not err in considering the evidence of McIntire's suspected involvement in the homicide as an aggravating factor in determining the sentences. The court did not make an independent finding of guilt regarding the murder and then sentence McIntire on the basis of that finding.

Reversed and remanded with regard to Docket No. 194301. Affirmed with regard to Docket No. 194362.

YOUNG, JR, P.J., dissenting in part, stated that the order dismissing the charges of murder and felony-firearm in Docket No. 194301 should be affirmed. The text of MCL 767.6; MSA 28.946 is clear and unambiguous and does not condition the grant of transactional immunity on truthful testimony. The only condition of the statute is that the witness give answers that may have tended to incriminate the witness. The majority concluded or conceded that at least some portion of McIntire's testimony may have tended to incriminate him. The Legislature did not overlook the problem that immunized witnesses might give false testimony and did not fail to indicate its intentions regarding how to deal with the problem. The Legislature has made an express choice to punish immunized individuals who give false testimony in grand jury proceedings by authorizing them to be prosecuted for perjury, MCL 767.19d; MSA 28.959(4).

1. STATUTES — JUDICIAL CONSTRUCTION.

A statute must be enforced as it is written if the statutory language is clear; if the statutory language is susceptible to more than one interpretation, a court must determine what the Legislature meant by the language; when the meaning of statutory language is questioned, a reasonable construction must be given by looking to the purpose subserved thereby, and the meaning must be derived from the statutory context within which the language is used; provisions of a statute must be construed in light of the other provisions of the statute in such a manner as to carry out the apparent purpose of the Legislature; statutory language should not be construed in an isolated or noncontextual manner, especially where such construction would render any statutory language surplusage, nugatory, absurd, or illogical.

2. Criminal Law — Statutory Immunity.

One who claims statutory immunity from prosecution must come within the terms of the statute, including both those terms that are express in the statute and those that are necessarily implied from the purpose and context of the statute.

3. Grand Jury — Witnesses — Immunity.

An objective of the statute regarding the granting of immunity to a witness compelled to testify before a one-man grand jury is to assist in the discovery of crime; therefore, a necessary component of the induced testimony is that it be truthful; the reference in the statute to a witness' obligation to provide an "answer" in exchange for immunity does not mean any utterance of words in reply, but refers to a truthful answer; an immunity agreement is void where the witness does not give truthful answers during immunized testimony (MCL 767.6; MSA 28.946).

4. Criminal Law — Due Process — Prearrest Delay.

A defendant must first demonstrate prejudice in order to establish a due process violation in the context of prearrest delay; the prosecution then bears the burden of persuading the court that the reason for the delay was sufficient to justify the resulting prejudice; the court evaluating the reason for the delay may consider the explanation for the delay, whether it was deliberate, and whether undue prejudice attached to the defendant.

5. Criminal Law — Due Process — Indictments.

A prosecutor does not violate due process by refusing to seek an indictment until satisfied that guilt beyond a reasonable doubt can be established; investigative delay, as opposed to delay that is intended to gain a tactical advantage over a defendant, generally does not violate due process.

6. Limitation of Actions — Criminal Law — Nonresidents.

MCL 767.24(1); MSA 28.964(1) plainly expresses the Legislature's intent to exclude from the six-year limitation period provided therein any period during which the party charged did not usually and publicly reside within this state; the provision does not limit the tolling of the running of the period only to instances where the nonresident suspect was not amenable to process or had absconded.

7. Evidence — Criminal Law — Witness' Motivation for Testifying.

A defendant is entitled to have disclosed to the jury a testifying accomplice's guilty plea to a reduced charge or receipt of a grant of

immunity, but reasonable limits may · be imposed on cross-examination regarding those issues.

8. CRIMINAL LAW — TRIAL — JUDICIAL MISCONDUCT — PARTIALITY.

A defendant in a criminal trial is entitled to a neutral and detached magistrate; the test is whether partiality could have influenced the jury to the detriment of the defendant's case; judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases generally do not support a challenge for partiality; expressions of impatience, dissatisfaction, annoyance, or anger that are within the bounds of what imperfect people sometimes display does not establish partiality.

9. EVIDENCE — CRIMINAL LAW — REBUTTAL EVIDENCE.

Rebuttal evidence is admissible to contradict, repel, explain, or disprove evidence produced by the other party and tending directly to weaken or impeach it; whether rebuttal is proper depends on what proofs the defendant introduced and not merely on what the defendant testified about on cross-examination; the test of whether rebuttal evidence was properly admitted is not whether the evidence could have been offered in the prosecutor's case in chief, but, rather, whether the evidence is properly responsive to evidence introduced or a theory developed by the defendant; as long as evidence is responsive to material presented by the defense, it is properly classified as rebuttal, even if it overlaps evidence admitted in the prosecutor's case in chief.

10. PERJURY — EVIDENCE.

Each of the elements of perjury, including the element that the defendant made a false statement, must be proved in order to obtain a conviction; that the defendant made a false statement is proved by establishing the truth of the contradiction; the prosecution must present evidence of circumstances bringing strong corroboration of the contradiction and does not satisfy its burden simply by contradicting the defendant's sworn statement.

11. SENTENCES — EVIDENCE.

A trial court may consider the evidence admitted at trial as an aggravating factor in determining an appropriate sentence; a court may not make an independent finding of guilt and then sentence the defendant on the basis of that finding.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Vicki P. Kundinger*, Prosecuting Attorney, *Donald J. McLennan*, Special Prose-

cuting Attorney, and *J. Ronald Kaplansky*, Assistant Attorney General, for the people.

State Appellate Defender (by *C. Joseph Booker*), for the defendant on appeal.

Charles R. McIntire, In Propria Persona.

Before: YOUNG, JR., P.J., and MARKMAN and SMOLENSKI, JJ.

MARKMAN, J. In Docket No. 194301 of these consolidated appeals, the prosecutor appeals as of right an order dismissing charges against defendant of open murder, MCL 750.316; MSA 28.548, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b; MSA 28.424(2). We reverse and remand for reinstatement of the charges. In Docket No. 194362, defendant appeals as of right his convictions of four counts of perjury committed in court, MCL 750.422; MSA 28.664, and resulting concurrent sentences of ten to fifteen years' imprisonment. We affirm.

I

Sometime during Sunday night, December 19, 1982, or early Monday morning, December 20, 1982, Nolan Fritz died in his home in Montmorency County. Fritz' body was discovered on December 21, 1982. The cause of death was determined to be multiple gunshots to the head by a .32 caliber gun. Defendant and Tom Fleck were suspected of being involved in the shooting, with Fleck being the suspected shooter. A Montmorency County circuit court judge directed that an inquiry (also known as a one-man grand jury) be made into the shooting, MCL 767.3; MSA 28.943, and

defendant, but not Fleck, was summoned to testify as
a witness. On January 26, 1983, defendant appeared
before the judge and answered several preliminary
questions before defendant's counsel asserted defend-
ant's constitutional right against self-incrimination.
The prosecutor moved in writing for an order grant-
ing defendant immunity and the judge entered an
order to this effect.[1] MCL 767.6; MSA 28.946.

Defendant then testified that on the night of
December 19, 1982, he was not with Fleck, but rather
he was playing cards at the home of John Knight
beginning at approximately 6:00 P.M. Defendant testi-
fied that present at Knight's home was defendant's
wife, Knight, Knight's wife and children, and several
neighbors. Defendant testified that he and his wife
left the Knight residence after 1:00 A.M. and went
home. Defendant testified that shortly thereafter he
left home, went to a grocery store, bought beer, and
then went to Fleck's home at approximately 2:00 A.M.
Defendant testified that he and Fleck then drove to a
number of locations, including stores, bars, restau-

---

[1] The motion and order stated as follows:

MOTION

Now COMES James E. McCormick, the Prosecuting Attorney of
Montmorency County, Michigan, and moves this Court for an Order
granting the witness, Charles McIntire, now present before the
Grand Jury ordered in this session, complete immunity from any
charges which would arise from the homicide of Nolan Fritz.
[Prosecutor's Signature]
ORDER

\*     \*     \*

IT IS SO ORDERED.
[Circuit Court Judge's signature]

rants, and houses, finally ending up at a bar in Rogers City at 8:00 A.M.

Defendant testified that he had known Fritz for approximately ten years and that he had delivered wood to Fritz. Defendant testified that he was not at Fritz' home on either the night of December 19, 1982, or the morning of December 20, 1982. Defendant denied being given a gun by Walter Crenshaw. Defendant also denied that he had owned a .32 caliber gun "on that particular day" or that he gave a .32 caliber gun to Fleck.

After the inquiry, the shooting remained unsolved. In July 1984, defendant moved from Michigan to South Carolina with his family. In approximately 1992, a Michigan State Police officer began reviewing the case. This officer subsequently contacted Fleck, who in 1994 finally implicated himself and defendant in the shooting. In August 1994, complaints were filed accusing defendant of open murder and felony-firearm and, in a separate case, of perjury committed in court. Warrants were issued for defendant's arrest, and he was finally returned to Michigan between late 1994 and early 1995.

Defendant moved to dismiss the murder and felony-firearm charges on the ground of immunity. The prosecutor responded that the immunity order was void or voidable if defendant either perjured himself or did not provide incriminating answers during the inquiry. The trial court determined that resolution of the immunity issue was premature because the perjury issue needed to be addressed first. The court therefore ordered that defendant's perjury case be tried first.

Fleck was a primary witness against defendant at defendant's January 1996 perjury trial. Following is a summary, in relevant part, of Fleck's testimony. On December 19, 1982, defendant came over to Fleck's house between 5:00 P.M. and 7:00 P.M. The two of them visited and drank beer. Neither of them had any money, but defendant told Fleck that he, defendant, knew where they could get money to buy more beer because he had borrowed money at this place before. Defendant and Fleck left Fleck's house between 11:00 P.M. and 1:00 A.M. and defendant drove the two of them to an elderly man's house. Upon entering the house, Fleck immediately proceeded to the restroom. Fleck was in the restroom approximately two or three minutes and during this time he heard "two bangs." Upon leaving the restroom, Fleck observed defendant pointing a gun in Fleck's direction. The gun was an old, small, chrome-plated revolver. Fleck also observed the elderly man slumped in a chair, apparently dead. Defendant handed the gun to Fleck and told Fleck to shoot the elderly man, and Fleck did so. Defendant and Fleck then drove away from the elderly man's house and went to a number of locations, including stores, bars, restaurants, and houses. During this time, Fleck became aware that defendant had taken a wallet containing approximately $60 from the victim's house. They bought beer and food and burned the wallet alongside a road. Within a week or two after the shooting, Fleck observed defendant throw the gun from a bridge into a river.

In addition, Walter Crenshaw's wife testified at trial that sometime before the Fritz homicide she observed her husband either sell or give defendant a small, possibly silver-plated, rusty, old handgun. She testified

that she did not know much about guns and that she did not actually touch this particular gun, but that she recalled that this gun did not look like it had a cylinder and that it was not a revolver. Another witness testified, after his recollection was refreshed, that before the Fritz homicide, defendant displayed to him a small pistol that he described as a "thirty-two."

Defendant was convicted of four counts of perjury committed in court for testifying falsely at the judicial inquiry about (1) his whereabouts on December 19 or 20, 1982,[2] (2) his companions on December 19, 1982 "and/or" December 20, 1982,[3] (3) his ownership or

---

[2] Specifically, the jury found that defendant made a false statement with respect to the following testimony at the inquiry:

*Q. [The Prosecutor]*: Mr. McIntire, after you met Mr. Fleck did you go to the home of Nolan Fritz?

*A. [Defendant]*: No.

\*     \*     \*

*Q. [The Prosecutor]*: Mr. McIntire, I am going to ask you, again, one more time, and you know what the Court has warned you about. Were you at the home of Mr. Nolan Fritz on the night of the 19th or the morning of the 20th of December, 1982?

*A. [Defendant]*: No, sir. I was not.

[3] Specifically, the jury found that defendant made a false statement with respect to the following testimony at the inquiry:

*Q. [The Prosecutor]*: All right. Okay. Were you with him [Fleck] on Sunday, December the 19th, 1982?

*A. [Defendant]*: No.

*Q. [The Prosecutor]*: You were not with him?

*A. [Defendant]*: Not on Sunday the 19th.

\*     \*     \*

*Q. [The Prosecutor]*: Now, I think you have already testified that you met Mr. Fleck about two o'clock on the morning of the 20th, is that correct?

*A. [Defendant]*: Yes.

transfer of a .32 caliber gun,[4] and (4) his receipt of a gun from Walter Crenshaw.[5]

Defendant thereafter renewed his motion to dismiss the charges of murder and felony-firearm on the ground of immunity. The trial court granted this motion. It found that defendant had been granted absolute transactional immunity that could not be voided by perjured testimony. Although describing this result as a "travesty," the court noted that the only "remedy" available in such a case was a charge of perjury.

II

We first turn to the prosecutor's appeal of the dismissal of the charges of murder and felony-firearm in Docket No. 194301. The issue we address here is simply whether testimony must be truthful in order to qualify for immunity from prosecution, i.e., whether a statutory requirement that one "answer" questions in a legal proceeding be construed as requiring that one answer such questions truthfully. In this case, defend-

---

[4] Specifically, the jury found that defendant made a false statement with respect to the following testimony at the inquiry:

> Q. [*The Prosecutor*]: Did you own a .32 caliber gun on that particular day?
> A. [*Defendant*]: No.
> Q. [*The Prosecutor*]: Did you give a .32 caliber gun to Mr. Fleck?
> A. [*Defendant*]: No.

[5] Specifically, the jury found that defendant made a false statement with respect to the following testimony at the inquiry:

> Q. [*The Prosecutor*]: Did you—I am on question six, now—were you given a gun by Walter Crenshaw?
> A. [*Defendant*]: No.
> Q. [*The Prosecutor*]: You never were?
> A. [*Defendant*]: That's right.

ant was granted immunity for his testimony at a one-
man grand jury investigation pursuant to MCL 767.6;
MSA 28.946, part of the Code of Criminal Procedure.
The purpose of this act, as indicated by the title of
the act as first enacted in 1917 PA 196, is "to author-
ize proceedings for the discovery of crime, and to
provide penalties for a violation of such procedure."
*People v Birch*, 329 Mich 38, 45; 44 NW2d 859 (1950).
MCL 767.6; MSA 28.946 provides in relevant part as
follows:

> No witness shall upon such inquiry be required to answer
> any questions, or shall be convicted for contempt upon
> refusal to do so, when the answers might tend to incrimi-
> nate him. A written order granting to such witness immu-
> nity from such incrimination may be entered by said judge
> pursuant to a written motion by the prosecuting attorney
> . . . , which order shall set forth verbatim the questions
> which such witness refused to answer. . . . *No person
> required to answer such questions shall thereafter be pros-
> ecuted for any offense concerning which such answers
> may have tended to incriminate him.* [Emphasis added.]

The prosecutor contends that by perjuring himself at
the inquiry, defendant forfeited his immunity from
prosecution.[6]

A fundamental right of a witness who fears that his
testimony may incriminate him in a proceeding of any
kind for which an oath is legally required, MCL
750.423; MSA 28.665, is the Fifth Amendment privi-

---

[6] We acknowledge that a witness is not required to actually and directly
incriminate himself in order to retain his transactional immunity as long
as his testimony "may have tended to incriminate" him. We assume for the
purposes of this opinion, without deciding, that "from the character of the
question[s]," *In re Schnitzer*, 295 Mich 736, 741; 295 NW 478 (1940), there
is some "tangible and substantial probability" that at least some portion of
defendant's testimony "may have tended to incriminate" him.

lege against compulsory self-incrimination. US Const, Am V. A witness may invoke this exception to the government's power to compel testimony in a criminal, civil, administrative, or legislative proceeding and choose to remain silent. *Kastigar v United States*, 406 US 441, 444-445; 92 S Ct 1653; 32 L Ed 2d 212 (1972); *People v Cheatham*, 453 Mich 1, 10, n 12; 551 NW2d 355 (1996). However, in order to facilitate the effective prosecution of crime, the practice of witness "immunity" has been developed as an accommodation between the government's power to compel testimony and the individual's right to avoid compulsory self-incrimination. *Kastigar, supra* at 446. "[I]n return for his surrender of his fifth amendment right to remain silent . . . , the witness is promised that he will not be prosecuted based on the inculpatory evidence he gives in exchange." *United States v Tramunti*, 500 F2d 1334, 1342 (CA 2, 1974); *Carchidi v State*, 187 Wis 438, 441-443; 204 NW 473 (1925). Thus the procedure is essentially " 'based on the theory of *quid pro quo*.' " *State v Smith*, 12 Wash App 514, 519; 530 P2d 354 (1974) (citation omitted). The witness provides otherwise unavailable information, usually, although not necessarily, about a criminal episode, in exchange for immunity from prosecution.

In the instant case, immunity was imposed on defendant pursuant to MCL 767.6; MSA 28.946. After defendant claimed his Fifth Amendment privilege against compulsory self-incrimination, the prosecutor informed defendant and the court that the state would grant complete immunity in return for defendant's testimony. Defendant's attorney then informed the court that, according to the procedures mandated by the statute, the "grant of immunity has to be pur-

suant to written motion of the Prosecutor and the Judge has to enter an order granting the witness immunity." Thereafter, the prosecutor prepared a written motion seeking defendant's complete, or "transactional" immunity, which the trial court granted. However, the one-sentence motion was clearly designed only to minimally satisfy the requirement of the statute. There were no additional conditions or terms specified.

Indeed, the prosecutor's motion was so peremptory that the statutory prerequisites for immunity were not referenced in the motion. The prosecutor moved for a grant of immunity, for example, without even specifying that defendant was first required to *testify* in order to qualify for immunity under the statute. However, because the motion was merely a procedural precondition mandated by the statute, and conferred only those benefits inherent within the statute in accordance with any conditions implicit within the statute, the lack of detailed language in the motion concerning the terms of the immunity is of little legal consequence. Although we recognize that a prosecutor and a witness might agree to supplement the basic statutory immunity with additional provisions and conditions, *People v Reagan*, 395 Mich 306, 318; 235 NW2d 581 (1975), in this case we are not faced with that situation, but are referred back to the statute, because the circumstances indicate clearly that immunity was granted only pursuant to MCL 767.6; MSA 28.946. Thus, we must examine the statute to determine the effect of defendant's false testimony on such immunity.

Statutory interpretation is a question of law that this Court reviews de novo. *People v Thomas*, 438

Mich 448, 452; 475 NW2d 288 (1991). The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent and purpose of the Legislature. *People v Stanaway*, 446 Mich 643, 658; 521 NW2d 557 (1994); *People v Gilbert*, 414 Mich 191, 200; 324 NW2d 834 (1982). If statutory language is clear, it must be enforced as it is written, but if it is susceptible to more than one interpretation, we must determine what the Legislature meant by the language. *People v Denio*, 454 Mich 691, 699; 564 NW2d 13 (1997). "When the meaning of statutory language is questioned, a reasonable construction must be given by looking to the purpose subserved thereby, and the meaning must be derived from the statutory context within which the language is used." *People v Parsons*, 142 Mich App 751, 756; 371 NW2d 440 (1985) (citations omitted). "Indeed, 'provisions of a statute must be construed in light of the other provisions of the statute, in such a manner as to carry out the apparent purpose of the Legislature.' *Workman v DAIIE*, 404 Mich 477, 507; 274 NW2d 373 (1979)." *Dagenhardt v Special Machine & Engineering, Inc*, 418 Mich 520, 529; 345 NW2d 164 (1984). This Court and the Supreme Court have refused to construe statutory language in an isolated or noncontextual manner, see *id.* at 529-530; *Ansell v Dep't of Commerce (On Remand)*, 222 Mich App 347, 357; 564 NW2d 519 (1997), especially where such construction would render "any statutory language surplusage, nugatory, absurd, or illogical," *id.* at 355. Indeed, MCL 760.2; MSA 28.842 explicitly provides that the Code of Criminal Procedure of Michigan, including MCL 767.6; MSA 28.946, is to be "liberally construed to effectuate the intents and purposes thereof."

One who claims statutory immunity from prosecution must come within the terms of the statute. *Smith, supra* at 517. This includes both those terms that are express in the statute and those that are necessarily implied from the purpose and context of the statute. In the statute at issue, there is no explicit language relating to truthful testimony in exchange for immunity; there is no express requirement that the immunized individual "answer" questions truthfully. However, contrary to the view of our dissenting colleague, this is not the end of the inquiry, in our judgment. In this case, we believe that we should not simply infer from the absence of an explicit requirement of truthful testimony, without further examination of the statute, that the Legislature intended to extend transactional immunity to witnesses who testify falsely. The consequence of providing untruthful testimony, and, therefore, of failing to comply with the inherent prerequisites of the statute, is an indispensable part of the subject matter of the instant statute. In our judgment, the Legislature could not intelligently or rationally deal with immunity and compelled testimony without considering the consequences of a suspect's failing to truthfully provide such compelled testimony. We will not simply infer an illogical meaning from statutory language where further inquiry into the context of the language may yield a more logical and reasonable result, as intended by the Legislature. *Wyandotte Savings Bank v State Banking Comm'r*, 347 Mich 33, 45; 78 NW2d 612 (1956). Words can be fully understood only when viewed in context; thus, the statutory requirement that a witness "answer" questions must be taken out of isolation to determine its meaning in this context. Consequently, here we

must consider the purpose, the text, and the context of the immunity statute to determine whether a requirement of truthfulness advances these considerations and, correspondingly, whether false testimony thwarts them.[7] As Justice COOLEY has remarked, it is "a very proper rule of construction that the whole is to be examined with a view to arriving at the true intention of each part." Cooley, Constitutional Limitations (7th ed, 1903), p 91.

We begin by noting that the statute in this case confers full "transactional" immunity, or " 'immunity from prosecutions for offenses to which compelled testimony relates.' " *People v Patterson*, 58 Mich App 727, 730; 228 NW2d 804 (1975), quoting *Kastigar, supra* at 443; *In re Colacasides*, 379 Mich 69, 84; 150 NW2d 1 (1967); see also *Paramount Pictures Corp v Miskinis*, 418 Mich 708, 737, n 11; 344 NW2d 788 (1984) (LEVIN, J., with KAVANAGH and CAVANAGH, JJ., concurring); MCL 767.6; MSA 28.946. This grant of "transactional" immunity is broader than the "use" or "derivative use" immunity that was held, long after the original enactment of this statute, to be coextensive with

---

[7] We note that the dissent perceives that we have "abandoned" traditional rules of statutory construction, "ignored" the plain text of the statute, created an ambiguity where none exists "in order to reach a desired result," enacted a "judicial ukase," turned traditional principles of statutory construction "inside out," acted without "authority," engaged in "rewriting" the law through "nontextual" analysis, created "new policy" from "wholecloth" and "substituted [our] own policy preferences" for those of the Legislature. Needless to say, we respectfully disagree. Although we have reached a different result than the dissent, we have no disagreement with the principles of jurisprudence set forth by the dissent. We fully agree with the dissent that "our obligation is, by examining the statutory language, to discern the legislative intent that may reasonably be inferred from the words expressed in the statute." *Post* at 119. However, adopting similar interpretative premises does not ensure that two opinions will necessarily reach the same conclusion in every case, but merely that the range of acceptable choices will be limited.

the Fifth Amendment privilege, and thus constitutionally required, where a witness is compelled to testify after invoking the privilege. *Kastigar, supra* at 453; *People v Safiedine*, 152 Mich App 208, 213, n 2; 394 NW2d 22 (1986); *Patterson, supra* at 731, n 1. "Use" and "derivative use" immunity protects a witness only from the " 'use of compelled testimony and evidence derived therefrom,' " *id.* at 730, quoting *Kastigar, supra* at 443, but the witness may still be prosecuted for a crime in which he was involved and to which his immunized testimony relates. Therefore, the Michigan Legislature has apparently granted more extensive immunity than is constitutionally required to those who are compelled to testify pursuant to MCL 767.6; MSA 28.946.

Accordingly, while keeping in mind that full "transactional" immunity is not constitutionally required, we address the immunity statute at hand. First, given that the objective of the instant statute is to assist in the "discovery of crime," not to grant amnesty,[8] a necessary component of the induced testimony is that it be truthful, so that it may—in fact or at least potentially—assist in the discovery of crime. If the witness is allowed to give false information without consequence, i.e., without adversely affecting his "transactional" immunity, not only are law enforcement officers not assisted in their responsibilities to investigate and prosecute crime, but they may be affirmatively hindered or obstructed in this regard by the testimony, as occurred in the case at hand. Here, after

---

[8] Immunity was envisioned by the Legislature as a means of reconciling a witness' constitutional rights under the Fifth Amendment with the need of the "People" to effectively investigate and prosecute criminal activities. It was not envisioned as an end in itself. See *Birch, supra* at 46.

defendant testified that he knew nothing about the murder of Fritz, prosecutors and the police apparently discontinued their investigation, and no one was charged in the case for over ten years.[9] Allowing a witness to testify falsely and still receive complete immunity would utterly defeat the purpose of this statute. As a result, we believe that viewing MCL 767.6; MSA 28.946 in the context of its explicit legislative purpose of assisting in the "discovery of crime" suggests strongly that an "answer" presupposes a truthful answer. Simply put, there is no reason to enact an immunity statute if it cannot compel testimony that is helpful, i.e., truthful, in discovering crime.

Second, the premise underlying immunity is that, while all witnesses are obligated to testify truthfully, those witnesses whose testimony would potentially expose them to criminal charges will be strongly inclined either to testify falsely or to not testify at all. However, once such a witness is placed in a position where he no longer has a basis for fearing criminal charges arising from his testimony, he is effectively situated in a position identical to any other witness— he is obligated to testify truthfully. This obligation extends, without exception, to all witnesses. The Fifth Amendment does not permit a witness to avoid giving testimony he would simply prefer to withhold. *Roberts v United States*, 445 US 552; 100 S Ct 1358; 63

---

[9] Due process considerations bar the state from using false evidence; to construe the immunity statute in a manner that might result in the state's relying upon perjurious testimony in another proceeding would give rise to serious constitutional problems, which can, and must, be avoided if another reasonable construction of the act will negate such constitutional difficulties. *People v Bandy*, 35 Mich App 53; 192 NW2d 115 (1971); *People v Wiese*, 425 Mich 448, 453-454; 389 NW2d 866 (1986).

L Ed 2d 622 (1980). And, in asserting the privilege against self-incrimination, the focus is on the consequences that a *truthful* answer might disclose. *Zicarelli v New Jersey State Comm of Investigation*, 406 US 472; 92 S Ct 1670; 32 L Ed 2d 234 (1972). Absent the presumption that witnesses will testify truthfully, the foundational pillar of our criminal justice system is necessarily undermined. This idea is so basic, in our judgment, that the very understanding of providing an "answer" to a question posed at a legal proceeding must presume a truthful answer. Indeed, one of the prerequisites of providing testimony, immunized or otherwise, is taking an oath or affirmation to tell the truth; defendant, in fact, was under oath when he testified falsely regarding material facts of his involvement in the murder. Certainly the Legislature was aware of the age-old requirement that witnesses take an oath to testify truthfully, and it presumably expected that witnesses seeking to avail themselves of the statute would be required to comply with this oath. In view of its altogether reasonable expectations in this regard, we do not believe that the Legislature would have allowed a witness to wholly avoid prosecution for a crime by dint of committing another crime, perjury.

Third, the practice of immunity is " 'based on the theory of *quid pro quo.*' " *Smith, supra* at 519 (citation omitted). The state exchanges immunity from prosecution for testimony that will help to identify and possibly bring before the bar of justice others involved in criminal activity. Immunity can be granted only where a witness, fearing that his statements will incriminate him in criminal activity, invokes his Fifth Amendment right not to testify. Therefore, in seeking

an order granting transactional immunity, a prosecutor must exercise a difficult option, forgoing prosecution of a suspected criminal in order to obtain otherwise unavailable information about a crime and the other criminals involved therein. Forgoing prosecution for one crime or criminal may be justified where the information obtained assists in solving and prosecuting another, usually more serious, crime that might otherwise evade sanction. However, where the testimony is false, the state is deprived of that which it was entitled to receive in exchange for its grant of immunity. If the state were to be held to this "deal," the witness would gain amnesty from prosecution while the state would sacrifice not only its ability to prosecute the witness for his part in the crime, but also its power to compel the witness' testimony and learn more about a criminal episode. This would enforce a bargain, an altogether illusory bargain, in which one party, the prosecutor, in exchange for something of great value—the nonprosecution of a criminal wrongdoer—receives nothing of benefits in return. We do not believe that the Legislature intended to warrant such an expensive sacrifice on the part of "the People" without demanding receipt of something of roughly equivalent value in exchange. Nor do we believe that the Legislature intended to confer such an unintended windfall upon a lawbreaker who, besides committing the crime for which immunity was proffered, perpetrated perjury to conceal the full extent of his wrongdoing.

On the basis of these three factors, we conclude that the immunity agreement is void and that defendant is not entitled to claim the benefits of the grant of full "transactional" immunity under MCL 767.6; MSA

28.946.  Holding the state to the grant of immunity in
the face of materially false testimony would thwart
the purpose of the immunity statute, undermine its
reasonably implied condition of truthfulness, and
render illusory a bargain struck between the prosecu-
tor and a criminal witness regarding a matter of the
highest importance to the security and tranquillity of
"the People." In our judgment, therefore, a require-
ment of truthful testimony is compelled by the lan-
guage of this statute when viewed in its obvious con-
text.[10] Contrary to the suggestions of the dissent, we
are not engaged here in resolving an "ambiguity" in
statutory language. Instead, we have sought to give
reasonable meaning to the statutory requirement that
a witness "answer" questions before a grand jury in
exchange for immunity. On the basis of our analysis,

---

[10] We do not agree with the dissent that the Legislature's enactment of
MCL 767.19d;  MSA 28.959(4),  concerning the availability of perjury as a
remedy against one who testifies falsely at a grand jury proceeding,
implies that no other remedies are available under MCL 767.6;   MSA
28.946.  Indeed, we do not believe that treating an immunity agreement as
void where a witness has failed to "answer" questions truthfully can prop-
erly be characterized as a "remedy" at all; rather, the terms of the agree-
ment have simply not been satisfied by both parties. The clear purpose of
MCL 767.19d;  MSA 28.959(4)  is to make clear that a grand jury proceed-
ing in Michigan is the type of proceeding to which the perjury remedy is
applicable. There is no reason why the Legislature should have been
expected, in enacting MCL 767.6;  MSA 28.946,  to have further provided
that, "oh, by the way, if you the witness do not comply with the terms of
this law, you should be forewarned that you will not receive its benefits."
It is wholly understandable why the Legislature would view it as unneces-
sary to explicitly set forth the consequences of a party's failing to live up
to its obligations under a statute—consequences which are implicit in the
statute itself—namely here the denial of a breaching party's ability to
enforce a quid pro quo. In our judgment, it is implicit under every law of
the state, as well as under every contract and deed entered into within its
boundaries, that to avail oneself of the benefits of a deal, one must first
comply with its conditions. That the dissent may disagree with us regard-
ing what these conditions are does not enable it to correctly conclude that
a negative implication arises from the Legislature's failure to expressly
specify such an obvious legal proposition.

we conclude that reference to a witness' obligation to provide an "answer," in exchange for immunity, cannot reasonably be interpreted to mean any utterance of words in reply, but that it refers to a truthful answer. Especially since the Legislature has chosen to confer "transactional" immunity by this statute, which is far broader than what is required by the constitution, such immunity need not be recognized unless every condition of the statute has been honored by the immunized witness. Where the witness does not comply with the statute, which we construe as demanding truthful "answers" during immunized testimony, he does not receive immunity. See *Smith, supra* at 516-518; *People v Norwood,* 312 Mich 266, 274; 20 NW2d 185 (1945). Defendant did not comply with the statute when he provided materially false testimony. Thus, such testimony did not suffice to confer "transactional" immunity under the statute and defendant can be charged and tried for murder and felony-firearm as a result of the death of Nolan Fritz.

III

We now turn to defendant's appeal of his perjury convictions in Docket No. 194362 and the arguments raised in his counsel's brief. Defendant first argues that he was denied due process by the eleven-year, seven-month delay between the date that he committed his perjury offenses (January 26, 1983) and the date that the perjury complaint and warrant were filed (August 1994). We review this constitutional issue de novo. *People v Pitts,* 222 Mich App 260, 263; 564 NW2d 93 (1997); see also *People v White,* 208 Mich App 126, 134-135; 527 NW2d 134 (1994).

In *People v Bisard,* 114 Mich App 784, 791; 319 NW2d 670 (1982), this Court held that in order to establish a due process violation in the context of prearrest delay a defendant must first demonstrate prejudice. The prosecutor then bears the burden of persuading the court that the reason for the delay was sufficient to justify whatever prejudice results. *Id.* In evaluating the reason for the delay, the court may consider the explanation for the delay, whether the delay was deliberate, and whether undue prejudice attached to the defendant. *Id.* at 786, 791.

On appeal, defendant contends that application of *Bisard* to this case requires reversal of his convictions.[11] Specifically, defendant contends that the delay in his perjury case caused the loss of a number of

---

[11] We note that in denying defendant's motion to dismiss on the ground of prearrest delay, the trial court applied the test enunciated in *Bisard* and concluded that, even assuming some prejudice, the delay in defendant's perjury case was justified. We further note that the test enunciated in *Bisard* has been applied often by this Court in cases considering the issue of preindictment or prearrest delay. See *People v Reddish,* 181 Mich App 625, 627; 450 NW2d 16 (1989); *People v Loyer,* 169 Mich App 105, 119; 425 NW2d 714 (1988).

However, unlike *Bisard,* a majority of the federal circuit courts of appeal, including the United States Court of Appeals, Sixth Circuit, place the burden on the defendant to show not only prejudice that is actual *and substantial,* but also to show intentional delay by the government to gain an unfair tactical advantage. *Jones v Angelone,* 94 F3d 900, 905 (CA 4, 1996); *United States v Brown,* 959 F2d 63, 66 (CA 6, 1992). In *White, supra* at 134, this Court, relying on *Brown* but without discussing *Bisard,* noted that in determining whether dismissal is warranted by a preindictment or prearrest delay, "a defendant must show substantial prejudice to his right to a fair trial and intent by the prosecution to gain a tactical advantage." Applying this test to a prearraignment delay, this Court found no due process violation. *White, supra.*

This Court must follow a rule of law established in a prior published decision of this Court issued on or after November 1, 1990. MCR 7.215(H)(1). However, because we find no due process violation even under the less stringent standard enunciated in *Bisard,* we decline to decide whether *White,* decided as it was in the context of prearraignment delay, establishes a rule of law that we are required to follow in this case

witnesses and physical evidence pertaining to the murder. However, defendant does not claim the loss of material witnesses or exculpatory evidence. Rather, defendant claims that the lost evidence might have been used to impeach Fleck's testimony. Certainly Fleck's testimony connecting defendant to the murder was crucial in this case because it provided much of the contradiction and corroboration necessary to convict defendant of perjury.[12] However, that any of the alleged lost evidence might have impeached Fleck is, at best, speculative. Moreover, defendant had substantial evidence with which to impeach Fleck at trial.[13] Cf. *People v Reddish*, 181 Mich App 625, 627-628; 450 NW2d 16 (1989). Thus, we conclude that defendant has not sustained his burden of showing that he was prejudiced by the delay.

However, assuming some prejudice under *Bisard*, we turn to a consideration of defendant's argument that the delay in this case was not justified. Defendant contends that the delay was not justified because probable cause existed in 1983 to charge him with at least three of the four perjury counts of which he was ultimately convicted. Specifically, with respect to count three (defendant's denial that he owned a .32 caliber gun or gave a .32 caliber gun to Fleck) and count four (defendant's denial that Walter Crenshaw gave him a gun), defendant contends that probable cause existed immediately after the judicial inquiry because Crenshaw testified that he had given defendant a .32 caliber gun. However, proof of perjury

---

and, if not, whether this Court should nevertheless utilize the federal majority approach in prearrest- or preindictment-delay cases.

[12] See discussion later in opinion.

[13] See discussion later in opinion.

requires more than simply proof of the contradiction.[14] A prosecutor does not violate due process when he refuses to seek an indictment until he is satisfied that he will be able to establish guilt beyond a reasonable doubt. *United States v Brown*, 959 F2d 63, 66 (CA 6, 1992). In this case, the prosecutor who questioned defendant during the judicial inquiry may certainly have had his doubts about the veracity of defendant's testimony during the judicial inquiry, but may not have been satisfied that he could establish defendant's guilt of perjury beyond a reasonable doubt at that time.

With respect to count two (defendant's denial that he was with Fleck on December 19, 1982), defendant also contends that probable cause could have been easily established if the police had not simply failed to pursue this case. However, testimony given during the evidentiary hearing regarding this issue below indicates that shortly after the homicide the police came to believe that they were no longer free to interview either defendant or Fleck, both of whom allegedly requested to consult with counsel. Moreover, other witnesses have maintained from the beginning of this case that defendant was playing cards at the Knight residence throughout the night of December 19, 1982. The investigation came to a standstill not because the police unjustifiably failed to pursue this case, but because the police had no other good leads to follow.

Defendant also implies that the various prosecutors who have been in charge of this case over the years have acted in bad faith. However, our review of the

---

[14] See discussion later in opinion.

record reveals no such bad faith. Rather, our review reveals that whether defendant could be successfully prosecuted for perjury depended in large part on whether it could be established that defendant was connected to the Fritz homicide. The homicide investigation came to a standstill not because of any lack of police or prosecutorial diligence, but because defendant and Fleck were not admitting their involvement in the homicide and the police were simply unable to gather enough other evidence to charge either of them. Generally, investigative delay, as opposed to delay that is intended to gain a tactical advantage over a defendant, does not violate due process. *Id.* Thus, even assuming that defendant suffered some prejudice by the delay in this case, we find no due process violation because the prosecution satisfied its burden under *Bisard* of establishing that the reasons for the delay were sufficient to justify the resulting prejudice.

Next, defendant raises an issue with respect to the nonresident tolling provision of the applicable statute of limitations. This statute provides in relevant part as follows:

> [A]ll . . . indictments [other than for certain crimes not at issue here] shall be found and filed within 6 years after the commission of the offense. *However, any period during which the party charged did not usually and publicly reside within this state shall not be considered part of the time within which the respective indictments shall be found and filed.* [MCL 767.24(1); MSA 28.964(1) (emphasis supplied).][15]

---

[15] The term "indictment" is to be treated as also referring to charges made by the filing of an information. *People v Russo*, 439 Mich 584, 588, n 1; 487 NW2d 698 (1992); see also MCL 767.2; MSA 28.942.

Defendant does not contend that, at any time after July 1984, he "usually and publicly" resided in Michigan. Rather, defendant has always acknowledged that in July 1984 he moved to and began residing in South Carolina. However, defendant contends that despite his Michigan nonresidency, the nonresident tolling provision should nevertheless be interpreted as not tolling the six-year period of limitation in this case because defendant did not leave Michigan in order to avoid prosecution, he lived openly in South Carolina, he was easy to locate by Michigan authorities, and his absence from Michigan did not impede the prosecutor from going forward with this case.

The trial court denied defendant's motion to dismiss on this ground below, finding that the nonresident tolling provision was plain and unambiguous and, as applied to the undisputed facts of this case, tolled the running of the six-year period of limitation. We find no apparent error in this regard. The Legislature is presumed to have intended the meaning it plainly expressed. *People v Gould*, 225 Mich App 79, 83; 570 NW2d 140 (1997). Here, the specific language of the statute plainly expresses the Legislature's intent to exclude from the six-year limitation period certain periods defined as "any period during which the party charged did not usually and publicly reside within this state . . . ." There is no question that defendant did not usually and publicly reside in Michigan after July 1984.

However, defendant contends that a departure from the nonresident tolling provision is justified under the facts of this case because a literal construction produces a result inconsistent with the purposes behind the statute, which is to prevent the inaccurate testi-

mony and unfairness that may result from stale evidence and dull memories. *People v McCausey*, 65 Mich 72, 73; 31 NW 770 (1887); *People v Budnick*, 197 Mich App 21, 24; 494 NW2d 778 (1992); *People v Allen*, 192 Mich App 592, 602; 481 NW2d 800 (1992). In response, we simply note that statutes of limitation are a matter of legislative grace and subject to legislative control. *People v Russo*, 439 Mich 584, 594; 487 NW2d 698 (1992). Despite any general policy against unduly postponing criminal prosecutions that is embodied in MCL 767.24; MSA 28.964, the Legislature saw fit to include a specific provision whereby the limitation period is tolled during "any period during which the party charged did not usually and publicly reside within this state . . . ." Thus, we find that application of the plain language of the nonresident tolling provision to the facts of this case does not produce an inconsistent result, but rather produces the result intended by the Legislature.

Alternatively, defendant notes that the courts in *Danuel v State*, 262 Ga 349, 352; 418 SE2d 45 (1992), and *Heitman v State*, 627 NE2d 1307, 1311 (Ind App, 1994), held that nonresident tolling provisions analogous to Michigan's provision tolled a criminal period of limitation only when the nonresident suspect was not amenable to process or had absconded. Defendant urges that we should similarly construe Michigan's nonresident tolling provision in light of the facts that he did not abscond from Michigan and was amenable to process. However, *Danuel* and *Heitman* appear to represent the minority view. See *Danuel, supra* at 357 (Bell, P.J., concurring). Most courts that have considered statutory tolling provisions analogous to Michigan's provision have held that mere

absence, regardless of intent to evade justice or conceal one's whereabouts, is enough to toll the criminal period of limitation.[16] See *State v Ansell,* 36 Wash App 492, 493-496; 675 P2d 614 (1984);  see also *State v Whitman,* 160 Wis 2d 260, 264-267; 466 NW2d 193 (Wis App, 1991); *State v Stillings,* 238 Mont 478, 482-484; 778 P2d 406, 408-410 (1989).  In so holding, the courts have reasoned that the statutory language is too clear to permit a different construction. *Whitman, supra* at 266; *Ansell, supra* at 493-496. Thus, in *Ansell,* the court held that the criminal period of limitation was tolled even though the nonresident defendant had lived openly in another state and was available for prosecution at all times. And, in *Stillings, supra* at 484, the court held that the criminal period of limitation was tolled even though state officials knew that the defendant was incarcerated out of state and the state could have forced the defendant's return at any point. Thus, we are not persuaded by defendant's reliance on *Danuel* and *Heitman.* We conclude that the trial court did not err in refusing to dismiss this case on this ground.

Next, defendant raises an issue with respect to witness Fleck. To put the issue in context, we note that at trial Fleck testified during both direct examination and cross-examination that, as a result of a plea agreement with respect to his involvement in the Fritz homicide, he had already pleaded guilty of being an accessory after the fact to murder. Fleck testified that he had not yet spent any time in jail because he had been permitted to post a $10,000 personal prop-

---

[16] In Michigan it is not simply mere absence, but such absence as destroys residency. *McCausey, supra.* In this case, there is no question that defendant did not reside in Michigan after July 1984.

erty bond using his home as collateral, as opposed to a cash bond, and that sentencing with regard to his plea had been deferred until after he testified at defendant's trial. Fleck acknowledged that the plea agreement contained his statements implicating defendant in the Fritz homicide and provided that, if he did not give truthful testimony consistent with these statements, then the accessory plea would be dismissed and the prosecutor could proceed with whatever charges were deemed appropriate, including first-degree murder.

The trial court precluded defendant from exploring, with either Fleck or other witnesses, the plea negotiations preceding Fleck's actual plea agreement, including a possible plea of guilty to a charge of manslaughter. In reaching this decision, the court reasoned that evidence of what had occurred during the plea negotiations would not prove anything that the actual plea agreement did not already prove. The court also noted that the terms of the actual plea agreement had been made abundantly clear to the jury and that the benefits of this agreement to Fleck were obvious and apparent, including the maximum benefit Fleck received in exchange for his testimony, i.e., not being subject to a possible charge of first-degree murder. The trial court decided to exclude the evidence of Fleck's plea negotiations under MRE 403 on the ground that this evidence would be cumulative, confusing, misleading, and duplicative.

Defendant now contends that the trial court's refusal to allow him to impeach Fleck with evidence that Fleck had rejected a proposal that he plead guilty to a charge of manslaughter denied defendant his right to present a defense and his right to confronta-

tion. We note that defendant fails to cite any portion of the record establishing that Fleck actually rejected such a proposal. Rather, our review of the record reveals, at most, that the prosecutor initially wanted Fleck to plead guilty to a charge of manslaughter and that Fleck's counsel discussed this proposal with Fleck.

A defendant has a constitutional right to present a defense and confront his accusers. *People v Posby*, 227 Mich App 219, 226; 574 NW2d 398 (1997); *People v Adamski*, 198 Mich App 133, 138; 497 NW2d 546 (1993). A primary interest secured by the right of confrontation is the right of cross-examination. *Adamski, supra.* The credibility of a witness is an issue that is of the utmost importance in every case and defendants are guaranteed a reasonable opportunity to test the truth of a witness' testimony. *Adamski, supra; People v Mumford*, 183 Mich App 149, 152; 455 NW2d 51 (1990). Evidence of a witness' motivation for testifying is highly relevant to the witness' credibility. *Mumford, supra.* Thus, a defendant is always entitled to have a testifying accomplice's receipt of a grant of immunity or guilty plea to a reduced charge disclosed to the jury. *Id.* However, trial courts have the discretion to impose reasonable limits on cross-examination on the basis of concerns about harassment, prejudice, confusion of the issues, or interrogation that is repetitive or only marginally relevant. *Adamski, supra.*

In this case, one of defendant's primary defenses was that Fleck was untruthful. In support of this theory, substantial evidence tending to impeach Fleck's credibility was adduced at trial. Specifically, the disclosure of the details of Fleck's plea agreement raised

an inference that Fleck had a significant motive to testify as he did or face a charge of first-degree murder. Fleck also admitted to defense counsel that he had lied during his cross-examination at the preliminary hearing in this case. Finally, Fleck, as well as other witnesses, testified that between 1982 and 1994, Fleck had given varying and inconsistent accounts of his involvement in the Fritz homicide to the police. On this record, we cannot say that defendant was denied his right to present his defense that Fleck was untruthful.

Moreover, defendant was permitted great latitude in confronting Fleck, including cross-examining Fleck regarding the details of the plea agreement. Where the inference was clearly raised that Fleck benefited greatly from his plea agreement because he was subject to a charge of first-degree murder but permitted to plead guilty of being an accessory after the fact, we conclude that additional evidence that a possible plea of guilty to a charge of manslaughter was also considered during plea negotiations was of only marginal value. The trial court reasonably limited Fleck's cross-examination and defendant was not denied his right to confrontation thereby. For similar reasons, we also reject defendant's claim that his due process rights were violated when the prosecutor failed to disclose to the jury that Fleck had allegedly rejected a proposal that he plead guilty to a charge of manslaughter. *People v Atkins*, 397 Mich 163, 173-174; 243 NW2d 292 (1976).

Next, defendant raises an issue with respect to witness Arthur Baker. At trial, Baker, a former detective with the Montmorency County Sheriff's Department who investigated the Fritz homicide, testified that

when he interviewed defendant shortly after the homicide, defendant never indicated that he had been with Fleck. Defendant contends that this testimony was extremely damaging because he later admitted that he was with Fleck on December 20, 1982. Defendant contends that he therefore should have been allowed to cross-examine Baker with evidence of Baker's bias or prejudice against defendant. Defendant contends that the trial court's refusal to allow him to impeach Baker denied him his constitutional rights to confrontation and to present a defense. However, assuming, without deciding, that the trial court erred in refusing to allow defendant to impeach Baker with evidence of Baker's alleged bias or prejudice, we conclude that any denial of defendant's constitutional rights was harmless beyond a reasonable doubt because two other police officers also testified that, when they interviewed defendant shortly after the Fritz homicide, defendant also did not indicate to them that he was with Fleck on December 20, 1982. *People v Belanger*, 454 Mich 571, 576; 563 NW2d 665 (1997).

Next, defendant cites approximately twelve instances in which the trial court allegedly demonstrated its partiality by criticizing or disparaging defense counsel. Defendant contends that he was denied a fair trial by this judicial misconduct. A defendant in a criminal trial is entitled to a neutral and detached magistrate. *People v Conyers*, 194 Mich App 395, 398; 487 NW2d 787 (1992). The test is whether partiality could have influenced the jury to the detriment of the defendant's case. *People v Cheeks*, 216 Mich App 470, 480; 549 NW2d 584 (1996). Judicial remarks during the course of a trial that are

critical or disapproving of, or even hostile to, counsel, the parties, or their cases do not generally support a challenge for partiality. *Cain v Dep't of Corrections*, 451 Mich 470, 497, n 30; 548 NW2d 210 (1996). Moreover, partiality is not established by expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women sometimes display. *Id.*

This case was hard-fought and hotly contested by both sides. Several times after defense counsel had raised an issue and argued his position, the trial court would request, often repeatedly, that counsel make a motion or otherwise ask for some sort of specific relief or action by the court. However, despite these requests, defense counsel would often continue to argue his position. At other times, the court would rule regarding an issue and counsel would continue to argue, often reiterating a prior position. Later in the proceedings, defense counsel would again raise the same issue, requiring the court to make the ruling again. There is no doubt that at times the court became frustrated with defense counsel's behavior in these respects. However, in our judgment, the court was also extremely patient with defense counsel and gave defense counsel great latitude in presenting defendant's case. Our review of the record reveals that the trial court's challenged remarks were, at most, simply expressions of impatience, dissatisfaction, annoyance, and anger that are fully within the "bounds of what imperfect men and women sometimes display." Moreover, the trial court gave at least two curative instructions with respect to some of these remarks. We conclude that the trial court's conduct was not partial and could not have influenced

the jury to the detriment of defendant's case. Accordingly, the trial court did not engage in judicial misconduct and defendant, therefore, was not denied a fair trial on this ground.

IV

Next, we consider those issues raised in the supplemental brief filed by defendant pro se. Defendant first argues that the trial court erred in allowing the prosecutor to present several rebuttal witnesses while denying defendant the opportunity to present certain surrebuttal testimony. Specifically, defendant takes issue with rebuttal testimony that he claims erroneously raised the damaging inference that he made an admission concerning the homicide. In order to place this issue into context, we note that defendant was the last defense witness to testify. During defendant's direct examination, defendant testified that while he was in Michigan on August 15, 1994, he went to see Fleck. Defendant testified that he had been informed by the police that Fleck had indicated that he, Fleck, had been at the murder scene "and all this stuff happened." Defendant testified that he did not know what Fleck was talking about and he went to see Fleck to talk to him and find out "what he was saying." Defendant testified that he did not talk to Fleck for any length of time because he was forced to leave Fleck's property when Fleck's son aimed a shotgun at him and shot at his vehicle.

After defendant's direct examination but before his cross-examination, the prosecutor informed the court that over the weekend the police had learned about and then interviewed a witness with critical new information about defendant's case. This witness was

Joyce McIntire, who was married to defendant's brother, Gary McIntire, and who was also the great-granddaughter of Nolan Fritz. As relevant to the present issue on appeal, Joyce McIntire had information indicating that in August 1994, defendant had made a certain statement to her. The prosecutor indicated that she was going to call Joyce McIntire for rebuttal. Defendant's objections to any rebuttal testimony by McIntire concerning defendant's alleged statement were overruled by the trial court.[17]

The prosecutor commenced her cross-examination of defendant, during which defendant testified that after leaving Fleck's house on August 15, 1994, he went to Gary and Joyce McIntire's house. The prosecutor elicited defendant's denial that, during a conversation concerning both the incident at Fleck's house and the Fritz homicide, Joyce McIntire had asked him why did he not talk to the police about what he knew about the homicide. The prosecutor also elicited defendant's denial that he had replied that he did not talk to the police because the incident involved a friend.

Joyce McIntire subsequently testified in rebuttal that on August 15, 1994, after defendant had been to Fleck's house, she had a conversation with defendant concerning the Fritz homicide during which she asked defendant why he did not tell the police what, if anything, he knew about the death. McIntire testified that defendant responded that, even if he knew

---

[17] After defendant's direct examination but before his cross-examination, the prosecutor gave the defense a copy of Joyce McIntire's interview with the police. Defendant was also permitted to interview McIntire before his cross-examination.

anything, he was not going to say anything because he did not want to get any friends in trouble.

Defendant argues, as he did below, that McIntire's testimony concerning defendant's statement violates the rules stated in *People v Losey*, 413 Mich 346, 351-352; 320 NW2d 49 (1982), and *People v Bennett*, 393 Mich 445, 449; 224 NW2d 840 (1975), that the prosecutor may not use rebuttal testimony to introduce substantive evidence that belonged in the prosecutor's case in chief and that the prosecutor may not elicit a denial during cross-examination for the purpose of injecting a new issue into the case.

We first note, however, that in *Losey, supra* at 351, n 3, the Supreme Court recognized

> that there may be occasional cases in which evidence that might have been admissible in the prosecutor's case in chief could be admitted in rebuttal. The prosecutor may not become aware of the evidence until after having rested.

Additionally, the Supreme Court recognized, *id.* at 352, n 5, that

> [t]here will, of course, be cases in which rebuttal evidence may properly be used to contradict testimony elicited on cross-examination where the cross-examination merely drew out the details of matters raised by defense witnesses.

Moreover, in *People v Figgures*, 451 Mich 390, 398-399; 547 NW2d 673 (1996) (citations omitted), the Supreme Court explained as follows:

> Admission of rebuttal evidence is within the sound discretion of the trial judge and will not be disturbed absent a clear abuse of discretion. . . .
> Rebuttal evidence is admissible to "contradict, repel, explain or disprove evidence produced by the other party

and tending directly to weaken or impeach the same." The question whether rebuttal is proper depends on what proofs the defendant introduced and not on merely what the defendant testified about on cross-examination.

Contrary to the dissent's insinuation, the test of whether rebuttal evidence was properly admitted is not whether the evidence could have been offered in the prosecutor's case in chief, but, rather, whether the evidence is properly responsive to evidence introduced or a theory developed by the defendant. As long as evidence is responsive to material presented by the defense, it is properly classified as rebuttal, even if it overlaps evidence admitted in the prosecutor's case in chief.

The *Figgures* Court further distinguished cross-examination that injects a new issue into the case from cross-examination that responds to an issue raised by the defendant. *Id.* at 401.

In this case, defendant himself, during his direct examination, testified about going to Fleck's house on August 15, 1994. Defendant's testimony about this incident injected the inferences that defendant had no knowledge about either the homicide itself or Fleck's involvement in the homicide. The prosecutor's cross-examination of defendant concerning his alleged statement to McIntire addressed the issue of defendant's knowledge about the homicide and the involvement of other persons in the homicide. Thus, the prosecutor's cross-examination of defendant merely drew out details of matters raised by defendant himself and did not inject a new issue into the case. *Id.* Rather, the inferences from this testimony during cross-examination directly contradicted the inferences injected by defendant.

Further, the information possessed by Joyce McIntire came to the attention of the police only during

trial when Joyce McIntire's mother, who was Nolan Fritz' granddaughter, heard media reports of testimony by defense witnesses that raised questions in the mother's mind. The mother first contacted Joyce McIntire and then contacted the police, who in turn contacted Joyce McIntire. Thus, there is no question here that the prosecutor did not become aware of the substance of McIntire's testimony until the prosecutor had rested her case. *Losey, supra* at 351, n 3. In summary, we conclude that the trial court did not clearly abuse its discretion in allowing the prosecutor to cross-examine defendant with respect to his statement and in admitting McIntire's testimony concerning defendant's statement. *Figgures, supra* at 398.

Next, defendant takes issue with rebuttal testimony involving defendant's wife. Defendant's proofs had indicated that he and his wife spent the evening of December 19, 1982, at the Knight residence playing cards with the Knights and the Gays, who were neighbors of the Knights. Defendant and his wife left the Knight residence after midnight and the Gays left the Knight residence approximately forty-five minutes to an hour before defendant and his wife. After arriving home, defendant's wife went to the bedroom and read a book while defendant left to go to Fleck's house. Defendant and his wife next saw each other on December 20, 1982, at approximately 5:30 P.M. or 6:00 P.M. when defendant and Fleck arrived at defendant's house. Defendant's wife then left to take their son to a school program. After defendant's wife arrived back home at approximately 8:30 P.M., she and defendant drove Fleck home. Defendant and his wife first heard about Fritz' being killed at approximately 6:00 P.M. on the December 22, 1982, evening news. Finally, defend-

ant's proofs indicated that defendant and his wife then went to the home of defendant's brother, Gary McIntire.

When Joyce McIntire was discovered as a witness, the prosecutor learned that she had information not only about defendant's statement, but also about three visits made by defendant's wife to Joyce McIntire's house. The circumstances surrounding these visits tended to raise the following inferences: (1) that defendant's wife went to Joyce McIntire's house on the night of December 19, 1982, looking for defendant, (2) that defendant's wife went back to Joyce McIntire's the next night, December 20, 1982, and essentially told Joyce McIntire to forget that she had been looking for defendant the previous night, and (3) that defendant and his wife went to Joyce McIntire's house on December 21, 1982, the day Fritz' body was discovered and before the news of the homicide was generally known, and informed Joyce McIntire that Fritz had been killed.

After defendant rested his case, the prosecutor recalled defendant's wife, who had already testified as a defense witness. The trial court granted the prosecutor's request to treat defendant's wife as a hostile witness and to utilize leading questions in her examination. The prosecutor elicited from defendant's wife a denial that, after arriving home from the Knight residence, she went to Gary and Joyce McIntire's home looking for defendant. She also denied that she went to the home the next day and told Joyce McIntire to tell anyone who asked that defendant was with her the previous night. Further, she testified that on a Wednesday she and defendant heard on the television that Fritz had been murdered and that she and

defendant then went to the McIntires' home to so inform them.

Defendant again relies on *Losey* to argue that, in putting defendant's wife back on the stand, the prosecutor was not rebutting any evidence produced by the defense, but rather was improperly reopening the prosecution's case and injecting a new issue through the use of cross-examination. Defendant also relies on *Losey* to argue that Joyce McIntire's testimony concerning the three visits to her home by defendant's wife was improper rebuttal evidence because it constituted substantive evidence that should have been offered in the prosecutor's case in chief. Again, we simply note that the prosecutor was not aware of the evidence possessed by Joyce McIntire until the prosecutor had rested her case. *Losey, supra* at 351, n 3. Moreover, the test for rebuttal evidence is not whether it could have been offered in the prosecutor's case in chief, but rather whether it was responsive to an issue raised by the defendant. *Figgures, supra* at 399. In this case, Joyce McIntire's testimony concerning the activities of defendant or his wife in visiting McIntire's residence contradicted the defense theories that defendant was at the Knight residence the entire evening of December 19, 1982, and that defendant had no knowledge of the homicide. *Id.* Thus, Joyce McIntire's testimony concerning these visits was altogether proper rebuttal testimony.

The prosecutor clearly wanted to question Joyce McIntire concerning statements defendant's wife made to Joyce McIntire during the visits to McIntire's house. However, if the statements were offered during McIntire's testimony for the truth of the matter, a hearsay objection would have been in order. MRE

801(c); MRE 802. Alternatively, if the statements were offered during McIntire's testimony to impeach defendant's wife by proof of prior inconsistent statements, an objection regarding the lack of foundation would have been potentially in order. MRE 613(b); *People v Barnett*, 165 Mich App 311, 315; 418 NW2d 445 (1987). Knowing this, the prosecutor sought to put defendant's wife back on the stand for the purpose of laying a foundation for impeachment purposes. In granting the prosecutor's request to do so, the trial court, in effect, permitted the prosecutor to reopen her cross-examination of defendant's wife. The reopening of proofs rests within the sound discretion of the trial court. *People v Keeth*, 193 Mich App 555, 560; 484 NW2d 761 (1992). Here, the trial court specifically limited the prosecutor's renewed cross-examination of defendant's wife to establishing a foundation for impeachment purposes. The renewed cross-examination did not inject new issues into the case but rather constituted further cross-examination regarding matters raised by the defense, i.e., defendant's whereabouts at the time of the homicide and defendant's knowledge of the homicide. *Figgures*, *supra* at 401. Defendant was subsequently able to effectively impeach Joyce McIntire's testimony during surrebuttal. And, the jury was properly cautioned that it could not use evidence of the prior inconsistent statements of a witness as substantive evidence, but rather could only use such evidence in assisting it in determining whether the witness was truthful. Because we find no undue advantage to the prosecutor or prejudice to defendant, we conclude that the trial court did not abuse its discretion in permitting

the prosecutor to reopen her cross-examination of defendant's wife.

Next, defendant takes issue with the rebuttal testimony of Duane Gay. Gay testified during rebuttal that he and his wife played cards with defendant at the John and Phylis Knight residence on the night of December 19, 1982. Gay testified that he and defendant were drinking and that during the card game defendant twice asked Gay whether Gay thought Gay could "kick [defendant's] ass?" and whether Gay wanted to "go outside and try it?" Gay testified that he finished the card game and that he and his wife then left the Knight residence because he felt uncomfortable. Defendant contends on appeal that this testimony did not constitute proper rebuttal because the prosecutor improperly injected the issue of the time that the Gays left the Knight residence during the cross-examination of defense witness Mark Knight, the son of John and Phylis Knight. Defendant also contends that the issue of defendant's combative attitude should have been introduced during the prosecutor's case in chief. We disagree. As indicated previously, defendant's own proofs indicated that he was at the Knight residence during the entire evening of December 19, 1982, and that he did not leave the Knight residence until after midnight. Defendant's own proofs also linked the time that he left the Knight residence to the time that the Gays left the Knight residence, i.e., approximately forty-five minutes to an hour earlier than defendant. Gay's testimony that he and his wife left the Knight residence within an hour of darkness, with the resulting inference that defendant also left the Knight residence much earlier than previously indicated by defendant's

proofs, tended to contradict or disprove the evidence offered by defendant concerning the time that defendant left the Knight residence. *Id.* at 399. Accordingly, we find that the admission of Gay's rebuttal testimony did not constitute a clear abuse of discretion. *Id.* at 398.

Finally, defendant argues that the trial court erred in refusing to allow the testimony of two surrebuttal witnesses for the purpose of contradicting, and thereby impeaching, the credibility of Joyce McIntire's testimony. We disagree. Rebuttal evidence must relate to a substantive rather than a collateral matter. *People v Humphreys*, 221 Mich App 443, 446; 561 NW2d 868 (1997). In this case, defendant was able to present surrebuttal witnesses that not only directly contradicted Joyce McIntire's testimony, but also impeached her credibility with evidence of bias or prejudice. In excluding certain other proposed surrebuttal testimony, the trial court found that the proposed testimony concerned collateral matters. We find no clear abuse of discretion with regard to this issue. *Figgures, supra.*

Next, defendant argues that the trial court erred in refusing to give defendant's requested instruction that the prosecutor must present "strong corroboration" to establish that defendant's allegedly perjured testimony was false. This Court reviews jury instructions in their entirety to determine if there is error requiring reversal. *People v Perez-DeLeon*, 224 Mich App 43, 53; 568 NW2d 324 (1997). The instructions must include all elements of the charged offense and must not exclude material issues, defenses, and theories, if there is evidence to support them. *Id.* A trial court may give additional instructions concerning an area

that was not covered in the standard jury instructions as long as these additional instructions accurately state the law and are applicable, concise, understandable, conversational, unslanted, and nonargumentative. *People v Lynn*, 229 Mich App 116, 121; 580 NW2d 472 (1998). Even if the instructions are imperfect, there is no error if they fairly presented the issues to be tried and sufficiently protected the defendant's rights. *Perez-DeLeon, supra.*

In order to convict a defendant of perjury, the prosecutor must prove each of the elements of the crime beyond a reasonable doubt, including the element that the defendant made a false statement. *People v Cash*, 388 Mich 153, 162; 200 NW2d 83 (1972); *People v Kozyra*, 219 Mich App 422, 428-429; 556 NW2d 512 (1996); *People v Honeyman*, 215 Mich App 687, 691; 546 NW2d 719 (1996). That the defendant made a false statement is proved by establishing the truth of the contradiction. *Cash, supra.* The prosecution cannot satisfy its burden simply by contradicting the defendant's sworn statement. *Kozyra, supra* at 429. "Rather, the prosecution must present 'evidence of circumstances bringing strong corroboration of the contradiction.' " *Id.* (quoting *Cash, supra*).

In this case, the trial court gave instruction CJI2d 14.1 (perjury committed in courts), which simply instructs the jury that it must find that "while under that oath the defendant made a false statement." However, the trial court refused defendant's request that CJI2d 14.1 be supplemented with a "strong corroboration" instruction in accordance with *Cash.* Certainly, such an instruction would have been an accurate statement of the law and could have been given. *Lynn, supra.* However, the instructions, as given,

included each of the elements of the charge of perjury. In addition, the jury was properly instructed with regard to circumstantial evidence and the burden of proof. Moreover, defendant raises no challenge to the sufficiency of the evidence of his convictions and our review reveals that the prosecutor presented evidence of circumstances bringing strong corroboration of the contradictions at issue in this case. Accordingly, even if the instructions regarding perjury were imperfect, we find no error because the instructions as given fairly presented the issues to be tried and sufficiently protected the defendant's rights.

Next, defendant argues that certain inadmissible opinion testimony by the police was erroneously admitted at trial. However, defendant failed to properly object to the admission of this testimony below. "It is well established that objections to admissibility not properly raised at trial cannot be later asserted on appeal." *People v Kilbourn*, 454 Mich 677, 685; 563 NW2d 669 (1997).

Finally, defendant argues that his ten-year minimum sentences are disproportionate. In this regard, defendant notes that his criminal history consists of no prior felony convictions and only several old misdemeanor convictions, yet the instant sentences constitute the most severe sentences permitted under the law.[18] The key test of proportionality is whether the sentence reflects the seriousness of the matter. *People v Lemons*, 454 Mich 234, 260; 562 NW2d 447 (1997). In imposing the maximum sentences permitted by law in this case, the trial court was clearly influenced by

---

[18] There are no sentencing guidelines for the crime of perjury. *Honeyman, supra* at 697.

the testimony admitted at trial concerning defendant's suspected involvement in the Fritz homicide. We find no error in this regard. A trial court may not make an independent finding of guilt and then sentence a defendant on the basis of that finding. *Gould, supra* at 89. However, a trial court may consider the evidence admitted at trial as an aggravating factor in determining an appropriate sentence. *Id.* In light of the obvious aggravating factors presented by this case, we conclude that defendant's ten-year minimum sentences are proportional to the offenses and the offender. *Lemons, supra.*

In summary, in Docket No. 194301, we reverse the dismissal of the charges of murder and felony-firearm and remand for reinstatement of these charges. In Docket No. 194362, we affirm defendant's convictions of and sentences for perjury.

SMOLENSKI, J., concurred.

YOUNG, JR., P.J. (*concurring in part and dissenting in part*). I concur fully with the majority's affirmance of defendant's convictions of perjury committed in court, MCL 750.422; MSA 28.664, in Docket No. 194362. However, I must respectfully dissent from my colleagues' conclusion in Docket No. 194301 that defendant may be tried for first-degree murder, MCL 750.316; MSA 28.548, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). Because I do not believe that the statute regarding the granting of immunity to a witness compelled to testify before a one-man grand jury, MCL 767.6; MSA 28.946, conditions its grant of transactional immunity on "truthful" testimony, I

would affirm the trial court's order dismissing the charges of first-degree murder and felony-firearm.

### I. APPLICATION OF TRADITIONAL PRINCIPLES OF STATUTORY CONSTRUCTION

Because our judicial role precludes imposing different policy choices than those selected by the Legislature, our obligation is, by examining the statutory language, to discern the legislative intent that may reasonably be inferred from the words expressed in the statute. *White v Ann Arbor*, 406 Mich 554, 562; 281 NW2d 283 (1979). A fundamental principle of statutory construction is that "a clear and unambiguous statute leaves no room for judicial construction or interpretation." *Coleman v Gurwin*, 443 Mich 59, 65; 503 NW2d 435 (1993). When a legislature has unambiguously conveyed its intent in a statute, the statute speaks for itself and there is no need for judicial construction; the proper role of a court is simply to *apply* the terms of the statute to the circumstances in a particular case. *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995); *Lake Angelus v Oakland Co Road Comm*, 194 Mich App 220, 224; 486 NW2d 64 (1992). Finally, in construing a statute, we must give the words used by the Legislature their common, ordinary meaning. MCL 8.3a; MSA 2.212(1).

These traditional principles of statutory construction thus force courts to respect the constitutional role of the Legislature as a policy-making branch of government and constrain the judiciary from encroaching on this dedicated sphere of constitutional responsibility. Any other nontextual approach to statutory construction will necessarily invite judicial speculation regarding the probable, but unstated,

intent of the Legislature with the likely consequence that a court will impermissibly substitute its own policy preferences. See *Cady v Detroit*, 289 Mich 499, 509; 286 NW 805 (1939) ("Courts cannot substitute their opinions for that of the legislative body on questions of policy."). Unfortunately, the majority has abandoned these traditional rules of construction, ignored the plain text of the statute before us, and substituted its own policy preferences for those of our Legislature by finding an unexpressed legislative intent that a witness who lies in a one-man grand jury proceeding forfeits statutory immunity granted under MCL 767.6; MSA 28.946. While I do not question the sincerity of my colleagues' effort, I view the majority opinion as a herculean, yet ultimately unsuccessful, attempt to create an ambiguity where none exists in order to reach a desired result, albeit one with which I might wholeheartedly agree were I a legislator authorized to enact policy.

The immunity statute, MCL 767.6; MSA 28.946, provides, in relevant part:

> No witness shall upon such inquiry be required to answer any questions, or shall be convicted for contempt upon refusal to do so, when the answers might tend to incriminate him. A written order granting to such witness immunity from such incrimination may be entered by said judge pursuant to a written motion by the prosecuting attorney . . . , which order shall set forth verbatim the questions which such witness refused to answer. . . . *No person required to answer such questions shall thereafter be prosecuted for any offense concerning which such answers may have tended to incriminate him.* [Emphasis added.]

The text of the statute is clear and unambiguous. It simply does not condition transactional immunity on

*truthful* testimony.[1] As I read the immunity statute, there is but one condition that the Legislature has imposed on a grant of transactional immunity: that the witness give answers that "may have tended to incriminate him." *Id.* The above-emphasized language of the statute would seem to admit of no contrary intent. It is hard for me to conceive of language the Legislature could have otherwise employed that would more emphatically have proclaimed that, once an immunized witness has provided answers tending to incriminate, no prosecution for offenses touching upon crimes associated with such answers may be had. Indeed, the "tended to incriminate" standard appears to present a rather low threshold that need be met in order to invoke the immunity protections of the statute. See, e.g., *People v Joseph,* 384 Mich 24, 29; 179 NW2d 383 (1970) (holding that the privilege against self-incrimination extends not only to answers that would in themselves support a conviction, but also to answers that would furnish a link in the chain of evidence needed to prosecute the defendant).

---

[1] The majority acknowledges that it was permissible for the prosecutor, as a condition for granting immunity, to add additional terms beyond that imposed by the statute. *Ante* at 84. Unfortunately, the prosecutor failed in this case to require truthful testimony as one such condition of the grant of immunity given.

It is this omission on the part of the prosecution that my colleagues seek to repair by rewriting the immunity statute. Indeed, despite the fact that the majority purports to be interpreting the immunity statute, the essential thrust of its analysis suggests that the majority believes that it is actually constructing a contractual undertaking. Therefore, the majority writes: "On the basis of these three factors, we conclude that the *immunity agreement* is void . . . ." *Ante* at 91 (emphasis added); see also *ante* at 92, n 10. We would do better by respecting the limitations of the statute and admonishing the prosecutors of this state to impose truthtelling as a condition of any agreement to grant immunity under the statute.

The majority, having concluded or conceded that "at least some portion of defendant's testimony 'may have tended to incriminate' him," *ante* at 82, n 6, should have, under the plain language of the statute and application of traditional rules of statutory construction, affirmed the trial court's dismissal of the murder and felony-firearm charges. Instead, the majority today enacts by judicial ukase a new statute requiring truthful testimony as a condition precedent to a grant of transactional immunity. The majority acknowledges that "there is no express requirement that the immunized individual 'answer' questions truthfully." *Ante* at 86.

### II. SINS OF AN UN*HOLY TRINITY*: THE SO-CALLED "ABSURD RESULT" RULE OF CONSTRUCTION[2]

---

[2] Reference is made here to the infamous case, *Church of the Holy Trinity v United States*, 143 US 457; 12 S Ct 511; 36 L Ed 226 (1892), that is sometimes recognized as a foundational stone of the "absurd result" rule of statutory construction. See *Salas v Clements*, 399 Mich 103, 109; 247 NW2d 889 (1976).

In *Holy Trinity*, the United States Supreme Court was required to determine whether the Holy Trinity Church, which contracted with a resident of England to be its pastor, had therefore violated a federal statute making it unlawful (and punishable by a fine) for any person to " 'in any way assist or encourage the importation or migration of any alien . . . into the United States . . . to perform labor or service of any kind in the United States . . . .' " *Id.* at 458. Although the Court conceded that the act of the church was "within the letter of [the statute]," and thus proscribed, the Court nonetheless concluded: "we cannot think Congress intended to denounce with penalties a transaction like that in the present case." *Id.* at 458-459. The Court explained: "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Id.* at 459.

In Michigan, this same so-called rule of statutory construction has been stated as follows: "[D]eparture from the literal construction of a statute is justified when such construction would produce an *absurd and unjust result* and would be clearly inconsistent with the purposes and policies of the act in question." *Salas*, n 2, *supra* at 109 (emphasis added).

I agree with Justice Scalia's description of such attempts to divine unexpressed and nontextual legislative intent as "nothing but an invitation to

Significantly, the majority never, with respect to the *text* of the statute, identifies the terms or phrases it finds to be ambiguous.[3] Rather, in order to justify its action in looking beyond the text to determine legislative intent, the majority embarks on an "absurd result" analysis in which the majority focuses not on what the Legislature *said* through the text of the statute, but what the majority believes the Legislature

---

judicial lawmaking." Scalia, A Matter of Interpretation: Federal Courts and the Law (New Jersey: Princeton University Press, 1997), p 21. This nontextual approach to statutory construction has unfortunately led my colleagues away from the task of determining the *Legislature's* expressed intent.

[3] My colleagues vehemently deny my charge that they have abandoned traditional rules of construction, but assert that, by using the same tools, they have simply reached a different set of conclusions. *Ante* at 87, n 7. The majority argues that when the meaning of a statute has been "questioned," construction must be determined by examining the purpose of the statute and the "statutory context" with which the language is used. *Ante* at 85. My critique of the majority's approach to statutory construction is a challenge of the majority's initial premise: when the language of a statute is internally consistent and not ambiguous, from whence arises the right of the Court to "question" its meaning?

I agree that, when one part of a statute points to one conclusion, while another part points elsewhere, the "contextual" approach of the majority is applicable in order to reconcile the two apparently divergent parts. See *Michigan Bell Telephone Co v Dep't of Treasury*, 229 Mich App 200, 212-217; 581 NW2d 770 (1998). However, the majority has never identified why the text of the immunity statute is internally inconsistent or ambiguous, thereby giving rise to the need for interpretation. In sum, I find entirely unpersuasive my colleagues' effort to "*re*define" the commonplace and unambiguous statutory term "answer."

Second, I specifically repudiate the majority's notion that the "context" of the immunity statute suggests a basis for ignoring the plain language of the statute. As I argue later, the majority's resort to nontextual policy bases for discerning the Legislature's intent to forfeit immunity when false testimony is given in a one-man grand jury proceeding is belied by the fact that the Legislature enacted a separate section of the criminal procedure code specifically to punish such behavior as perjury. Thus, to the extent that this Court is authorized to look beyond the text of the immunity statute—a premise that I dispute—the perjury statute supplies a nearly irrefutable clue that the Legislature intended perjury, not immunity forfeiture, as the penalty for giving false testimony.

*must really have meant* despite the language it used.
The essence of the majority's position is that it con-
cludes that the Legislature could not have intended a
perjury charge to be the sole consequence for testify-
ing falsely before a one-man grand jury. Therefore, in
order to avoid what it believes would be an "illogical"
result, the majority expends a great deal of interpreta-
tive justification to "infer" a legislative intent that the
immunity granted by MCL 767.6;   MSA 28.946   not
apply when a witness gives "materially false testi-
mony." *Ante* at 91.

The majority asserts that the "Legislature could not
intelligently or rationally deal with immunity and
compelled testimony without considering the conse-
quences of a suspect's failing to truthfully provide
such compelled testimony." *Ante* at 86. On the basis
of that premise, the majority purports to scrutinize
"the purpose, the text, and the context of the immu-
nity statute" in search of "a more logical and reasona-
ble result . . . ."[4] *Ante* at 86. However, the logical
force of the majority's argument is entirely eviscer-

---

[4] I cannot agree with my colleagues that, because the Legislature chose
a remedy that the majority finds in this case to be inadequate, the Legisla-
ture failed to recognize that the goal of the immunity statute is to obtain
"helpful," hence "truthful," testimony. For the purposes of my analysis, I
need not disagree with the majority that the goal of the immunity statute
at issue here is to compel truthful testimony. The difference in our
approach and respective conclusions is not a disagreement on the goal of
the statute, but on whether the Legislature has foreclosed this Court's
right to establish a *penalty* other than that which the Legislature has
chosen.

Thus, while the majority makes compelling arguments that support a
rational, but different, policy choice regarding an appropriate penalty for
perjury committed by a witness given immunity under the statute, the
object of judicial statutory construction is not to determine whether there
are valid *alternative* policy choices that the Legislature may or should
have chosen, but to determine from the text of the statute the policy
choice the Legislature *actually* made.

ated by the fact that the Legislature *did* deal with the prospect of false testimony given in a one-man grand jury proceeding. It did so by enacting a separate section of the criminal procedure code expressly prohibiting perjury in *any* grand jury proceeding. See MCL 767.19d;  MSA 28.959(4).[5]

From the explicit terms of these statutes, two indisputable things are established: (1) that the Legislature did not overlook the "problem" posed by the majority, but was fully aware of the fact that some immunized individuals might give false testimony in grand jury proceedings, hence its enactment of the grand jury perjury statute, and (2) that the Legislature did not fail to indicate its intentions concerning how it wished to deal with false testimony in this context, but instead selected a specific remedy to deal with this problem. From these two facts I am forced to conclude that I need "infer" nothing about the intent that the Legislature made so plain in enacting these two statutes. The Legislature made an express choice to punish otherwise-immunized false swearers by authorizing their prosecution for perjury. This is the policy choice that I believe this Court is obligated to respect and enforce. By contrast, my colleagues in the majority have turned traditional statutory construction principles inside out in order to achieve a different desired result. The majority is able to invoke

---

[5] MCL 767.19d;  MSA 28.959(4)  provides:

> A person who wilfully swears falsely under oath in regard to any matter or thing upon which he is being examined is subject to the penalties of perjury as prescribed by law.

I also note that perjury committed in any court proceeding has been prohibited by separate statute since as early as 1846. See MCL 750.422;  MSA 28.664.

its "implied remedy" of withdrawing defendant's immunity in this case *only* by ignoring both the language of the immunity statute itself *and* the separate statute prohibiting perjury in grand jury proceedings. The majority has the power to do so; it does not have the authority.

It is clear that the majority believes that a perjury prosecution should not be the only consequence when a witness who is given statutory immunity testifies falsely before a one-man grand jury. However, under the clear and unambiguous language of the immunity statute, especially when considered in light of the separate prohibition against perjury in all grand jury proceedings, our Legislature has concluded otherwise and expressly said so. Whether the Legislature's choice to limit the range of penalties for lying in grand jury proceedings to prosecutions for perjury serves as a sufficient deterrent to perjury in this context is simply not this Court's concern. " '[I]t is not required that we should be sure as to the precise reasons for [a particular statutory] judgment or that we should certainly know them or be convinced of the wisdom of the legislation.' " *Cady, supra* at 509 (citation omitted); see also *Melia v Employment Security Comm*, 346 Mich 544, 561; 78 NW2d 273 (1956). To paraphrase the apt observation Justice RILEY made in another context, in our democracy, a legislature is free to make inefficacious or even unwise policy choices. The correction of these policy choices is not a judicial function as long as the legislative choices do not offend the constitution. Instead, the correction must be left to the people and the tools of democracy: the "ballot box, initiative, referendum, or consti-

tutional amendment." *Dedes v Asch*, 446 Mich 99, 123-124; 521 NW2d 488 (1994)  (RILEY, J., dissenting).

### III. CONCLUSION

It cannot be gainsaid that if the Legislature intended that immunity be forfeited completely upon the giving of false testimony, it could easily have said so.[6] However, the Legislature did not, and I believe that the majority mistakenly reads that condition into the statute to further policy concerns that the majority, but apparently not the Legislature, prefers. Because I am unable to reconcile the majority's analysis with traditional rules of statutory construction and what I believe is a proper reading of MCL 767.6; MSA 28.946, I respectfully dissent from its conclusion that defendant may be tried for murder and felony-firearm. I would, therefore, affirm the trial court's order in Docket No. 194301.

---

[6] Considering the fact that, in many cases (such as this one), the punishment for the underlying crime that is the subject of the grand jury testimony will be far greater than that for perjury, I find it particularly troubling to infer without some legislative guidance a provision that would, as a consequence of lying under oath, completely remove a witness' immunity from prosecution.

Having in effect created such a provision from wholecloth, the majority fails to suggest how to determine in a given case whether a witness' false testimony is sufficiently false to warrant a finding that immunity has been forfeited. These are, however, mere "practical problems" that our Court is wont to pass off as issues to be addressed on another day. I merely note for the record that it is the majority's insistence upon creating a new policy not found in the statute that has caused the breach in the damworks.