# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KIEFER DERIK OLGER,

        Defendant-Appellant.

UNPUBLISHED
June 27, 2017

No. 331705
Ingham Circuit Court
LC No. 15-000159-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KIEFER DERIK OLGER,

        Defendant-Appellant.

No. 331876
Ingham Circuit Court
LC No. 15-000162-FH

---

Before: GADOLA, P.J., and JANSEN and SAAD, JJ.

PER CURIAM.

In these consolidated appeals, defendant, Kiefer D. Olger, appeals as of right his convictions arising from a joint trial held before a single jury. In Docket No. 331705, the jury convicted defendant of delivery of a controlled substance causing death, MCL 750.317a, and delivery of less than 50 grams of a controlled substance, MCL 333.7401(2)(a)(*iv*), arising from the death of Jonathan Singer, who overdosed on heroin on September 12, 2013. In Docket No. 331876, the jury convicted defendant of delivery of less than 50 grams of a controlled substance, MCL 333.7401(2)(a)(*iv*), arising from a controlled buy by an undercover police officer that occurred on November 12, 2013. The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to 220 to 400 months' imprisonment for his conviction of delivery of a controlled substance causing death and 48 to 360 months' imprisonment for his conviction of delivery of less than 50 grams of a controlled substance in Docket No. 331705 and 60 to 360 months' imprisonment for his conviction of delivery of less than 50 grams of a controlled substance in Docket No. 331876. On appeal, defendant argues that his conviction for delivery of a controlled substance causing death was not supported by sufficient evidence; he was denied the effective assistance of counsel; he was denied a fair trial by the trial court's

-1-

demonstrations of bias; and his convictions and sentences in Docket No. 331705 violated the constitutional protection against double jeopardy. We disagree, and therefore affirm defendant's convictions and sentences.

## I. SUFFICIENCY OF THE EVIDENCE

"Claims of insufficient evidence are reviewed de novo." *People v Kloosterman*, 296 Mich App 636, 639; 823 NW2d 134 (2012). A reviewing court "must view the evidence in the light most favorable to the prosecution and determine whether the evidence was sufficient to allow any rational trier of fact to find guilt beyond a reasonable doubt." *Id*. "All conflicts in the evidence must be resolved in favor of the prosecution." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Kosik*, 303 Mich App 146, 151; 841 NW2d 906 (2013).

Section 317a of the Michigan Penal Code, MCL 750.1 *et seq*., provides the following:

> A person who delivers a schedule 1 or 2 controlled substance, other than marihuana, to another person in violation of section 7401 of the public health code, 1978 PA 368, MCL 333.7401, that is consumed by that person or any other person and that causes the death of that person or other person is guilty of a felony punishable by imprisonment for life or any term of years. [MCL 750.317a.]

"MCL 750.317a is a general intent crime, and as such does not require the intent that death occur from the controlled substance first delivered in violation of MCL 333.7401." *People v Plunkett*, 485 Mich 50, 60; 780 NW2d 280 (2010). Instead, the defendant need only intend "the *delivery* of a schedule 1 or 2 controlled substance." *Id*. "The Legislature has determined that heroin, a narcotic, is a schedule 1 controlled substance within the meaning of the controlled substances act." *Id*. at 59, citing MCL 333.7212(b).

Defendant does not dispute that Singer died as a result of consuming heroin; rather, he argues that the evidence was insufficient to show that he provided the heroin that caused Singer's death. The prosecution was not required to prove that defendant delivered heroin directly to Singer. A person violates MCL 750.317a if he or she delivers heroin "to another person . . . that is consumed by that person *or any other person* and that causes the death of that person . . . ." (Emphasis added.) Deputy William Lo testified that, during a controlled buy in November 2013, defendant mentioned a "John" "that he knew that had OD'd on heroin." According to Lo, defendant told him that the night of the overdose, "he dealt with John and [another man named] Jesse as part of a group of kids from the Dewitt area." Lo said that defendant told him "that he had sold them heroin and some other—other narcotics." Lo's testimony alone was sufficient to support a finding that defendant delivered heroin "to another person" on September 11, 2013.

Further, Jesse Trim, Austen Connelly, and defendant testified that Trim went to defendant's home on the evening of September 11, 2013, to purchase "Molly," also known as ecstasy. Text messages from Trim's cell phone corroborate that a transaction occurred. Although the transaction purportedly concerned "Molly," "a jury is free to believe or disbelieve, in whole or in part, any of the evidence presented." *People v Perry*, 460 Mich 55, 63; 594

NW2d 477 (1999). Trim further agreed that, while he and Singer were in defendant's home, defendant and Singer went into the next room for a couple of minutes and he was unable to see Singer during that time. Trim answered affirmatively when asked if he observed "Defendant and John shake hands in any way," which he said occurred "[r]ight as we were leaving." Viewing this evidence in a light most favorable to the prosecution, a rational jury could find beyond a reasonable doubt that defendant delivered heroin to someone in the group of Trim, Connelly, and Singer while they were at his home.

Defendant argues that even if Singer received heroin from him on September 11, 2013, it is not clear that this was the heroin that caused his death. We conclude that the evidence presented at trial was sufficient to allow a rational jury to infer beyond a reasonable doubt that the heroin delivered by defendant was then consumed by Singer. First, the heroin Singer consumed before his death was packaged similarly to the heroin defendant delivered on other occasions. Trim testified that he had observed defendant sell heroin and that it "was always in lottery tickets" and was in the form of a "[d]ark powdery substance." Trim testified that on the night of Singer's death Singer entered a gas station bathroom after announcing that "he had heroin," and when Trim entered the same bathroom, he saw "two empty lottery tickets." When asked if he "notice[d] anything on or near the lottery tickets that caught your attention," Trim answered, "Powder. It was really powdery." Deputy Lo testified that when he purchased heroin from defendant during the controlled buy, defendant "provided me with a folded piece of cut lottery paper" which contained "powdered heroin." Trim also believed that Singer later went to his vehicle to consume heroin. Officer Chad Vorce testified that a search of Singer's vehicle produced "a lottery ticket or a receipt and there was a bindle with heroin residue wrapped up inside."

Cell phone records also established that Trim called defendant numerous times in the early morning hours of September 12, 2013. Singer's girlfriend, Lindsey O'Leary, testified that Trim was "freaking out" and thought Singer was overdosing when she talked to him around that same time. O'Leary testified that she discussed calling an ambulance with Trim and added,

> [T]hey [presumably Trim and Connelly] also discussed, I think in my statement I said Keith, but I know . . . now that I know his name, Keifer. They called him because he is the one that they said had sold it. So they were calling him to figure out, I guess, what to do.

Trim remembered calling defendant that night, and when asked, "Why did you call the Defendant," Trim replied, "I am guessing it was to ask what to do. What was going on with John?" Although Singer ingested multiple substances that day, it was clear that Trim attributed Singer's dire state to heroin, as he explained, "I've never seen anyone that messed up on heroin." A rational jury could infer that Trim called defendant because he knew or believed that defendant supplied the heroin that was causing Singer's adverse reaction.

Defendant's cellphone calls and text messages to Trim and Connelly following Singer's death were also evidence of a guilty conscience. Trim testified that when he spoke to defendant after Singer's death, defendant was unusually friendly and "sounded worried." Defendant asked Trim if he was talking to the police and "really kept asking about Austen Connelly, and kept asking if he was going to tell—he was really worried about Austen, and it was extremely

-3-

obvious." Connelly testified that defendant called or texted him after Singer's death "four or five times a day for, like, a week." "Evidence that a defendant made efforts to influence an adverse witness is relevant if it shows consciousness of guilt." *People v Schaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010).

Defendant argues that there was evidence that Singer may have received heroin from someone named "Jamo" or "Jamal." Trim testified that he initially told law enforcement "that I thought [Singer] got [the heroin] from Jamo," but now maintained that it "was Keifer." Officer Bruce Ferguson testified that he conducted follow-up interviews with Trim and Connelly after obtaining their original statements. When asked why he decided to conduct these interviews, Ferguson replied,

> Well, as were [sic] going through the investigation, we were obviously learning more information. By this time we had the phone records. And in the phone records we could, you know, kind of chronologically see what was going on at what time and who did what and said what.

A rational jury could have inferred that Trim was less than truthful during his initial interview and that he provided a different version of events after his phone records showed text messages with defendant on September 11, 2013, which suggested a drug transaction, and additional communications with defendant in the early morning hours of September 12, 2013.

Further, the police searched Singer's vehicle and Trim's and Singer's residences, but the only heroin found was "residue" on a lottery ticket in Singer's vehicle. Therefore, contrary to defendant's assertion on appeal, there was no evidence to suggest that Singer consumed heroin procured from different sources leading up to his death. In any event, "it is unnecessary for the prosecutor to negate every reasonable theory consistent with the defendant's innocence. It is sufficient if the prosecution proves its own theory beyond a reasonable doubt in the face of whatever contradictory evidence the defendant may provide." *People v Carson*, 189 Mich App 268, 269; 471 NW2d 655 (1991). Viewing all of this evidence in a light most favorable to the prosecution, we conclude that a rational jury could find beyond a reasonable doubt that defendant delivered the heroin that caused Singer's death.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Whether a defendant has been denied the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Appellate courts review a trial court's factual findings for clear error and review constitutional questions de novo. *Id.* Because defendant failed to preserve his ineffective assistance claim in the trial court, our review is limited to mistakes apparent on the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

"To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) that his attorney's performance was objectively unreasonable in light of prevailing professional norms; and (2) that he was prejudiced by the deficient performance." *People v Walker*, 497 Mich 894, 895; 855 NW2d 744 (2014). "To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding

would have been different." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). We presume that counsel was effective and a defendant must overcome a strong presumption that counsel's actions constituted sound trial strategy. *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015). "Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy[.]" *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). We will not substitute our judgment for that of counsel regarding strategic matters and will not assess counsel's competence with the benefit of hindsight. *People v Garza*, 246 Mich App 251, 255; 631 NW2d 764 (2001).

Defendant first argues that his counsel failed to adequately prepare for trial. "A defendant is entitled to have his counsel prepare, investigate, and present all substantial defenses." *People v Kelley*, 186 Mich App 524, 526; 465 NW2d 569 (1990). "A substantial defense is one that could have affected the outcome of the trial." *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). Reviewing courts must determine whether "strategic choices [were] made after less than complete investigation, or if a reasonable decision [made] particular investigations unnecessary." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks and citation omitted; alterations in *Ackley*).

During defendant's direct examination, his counsel asked, "Do you need to speak with me privately before I end my examination of you?" to which defendant responded, "Yeah. I do. I should." The prosecution objected, and the trial court ruled that defense counsel was not allowed to privately confer with defendant, stating, "You have had months to discuss this case with your client." Defense counsel then asked defendant, "Is there something about a phone call that you want to tell us about?" The court interjected and stated, "You've got to ask a specific question that directs your witness to an area of inquiry so the Prosecutor and me know what it is." Defense counsel continued to question defendant:

> *Q*. A moment ago you used the word phone call when responding to my question about whether you needed to speak to me. Do you remember that just a few minutes ago?
>
> *A*. Yes.
>
> *Q*. Okay. What is it that you wanted us to know?
>
> *A*. He was naming—
>
> *Q*. He who?
>
> *A*. Jesse [Trim], when he called me about the overdose, and I remember saying to him, I'm, like, why did you—why did you allow someone to mix heroin with Xanx?
>
> *Q*. Why is that something important to you?
>
> *A*. I just thought it was dumb. And he said right away, he said, it's not my fault. *He wanted to stop at Jamo's*. [Emphasis added.]

-5-

The prosecution objected to defendant's testimony on hearsay grounds.  Defense counsel argued that Trim's statement was admissible as an exited utterance.  The trial court stated the following:

> *The Court*: No.  No.  That's—don't even consider that, ladies and gentleman, please.  This is out of—I don't know where it's from.  It is disregarded completely.  Move on.

> *Mr. Watson* [*Defense Counsel*]:  You want my foundation for that, then?

> *The Court*:  What I want you to do is ask a question so that we know what the proposed answer could be ahead of time instead of saying, would you like to add anything else?

> *Mr. Watson*:  Okay, Judge.

> *The Court*:  I have told you now twice, and now you did it and let him sneak that in when you knew there would be a problem with it.  So I don't like it, Mr. Watson.  Why do you do this?  That is stricken, sir.  Do you understand now?

Defense counsel continued to ask defendant about Trim's demeanor during the phone conversation.  The trial court then interjected, stating the following:

> *The Court*:  Excuse me.  I have already stricken this.
> *Mr. Watson*:  All right.  Judge.

> *The Court*:  It has been—wait a minute.  What do I have to do here?  Do I need to get down and throw something at you to get you to understand that I struck this line of inquiry?  Where do I have—what do I need to say to get you attention?  Is this word contempt something you like to hear?

> *Mr. Watson*:  Not really, Judge.

> *The Court*:  Then I would suggest that you follow the Court's order.  If I am wrong, those illustrious people downtown will overrule me.  It doesn't happen often, but it has, and maybe you are right.

> *Mr. Watson*:  In explanation, Judge?

> *The Court*:  I don't want an explanation.  Why don't you stop?  Ask your question if you have another area.  Stop it.  What can I do with you?  I'm sorry.  It's the end of it.  Next question.

Defendant argues that this exchange could have been avoided if his counsel had adequately prepared by discussing defendant's testimony with him before trial.  Defendant's testimony regarding Trim's statement that Singer "wanted to stop at Jamo's" may have been

admissible as an exited utterance. See MRE 801(c); 802; 803(2).[1] However, it is not clear from the record whether the trial court struck defendant's testimony about Trim's statement because the court erroneously believed that the testimony was inadmissible hearsay or because the court did not approve of the manner in which defense counsel elicited the testimony. To the extent the trial court improperly excluded defendant's testimony about Trim's statement as inadmissible hearsay, this is an evidentiary issue that defendant abandoned on appeal by failing to raise it in his statement of the questions presented. See *People v McMiller*, 202 Mich App 82, 83 n 1; 507 NW2d 812 (1993). Alternatively, if the trial court excluded defendant's testimony because of the purportedly improper manner in which defense counsel elicited the testimony, this is not apparent from the record and therefore cannot support defendant's ineffective assistance claim. See *Heft*, 299 Mich App at 80.

Moreover, defendant cannot demonstrate that defense counsel's alleged failure to properly elicit defendant's testimony concerning Trim's statement deprived him of a substantial defense or prejudiced his trial. Defense counsel questioned O'Leary, Trim, and a friend of Singer's, Mitchell Pollie, about their statements to law enforcement that Singer received heroin from "Jamo" or "Jamal." During his closing argument, defense counsel argued that the testimony presented a "theory that the source of this heroin was not in fact, my client at all, but this fellow Jamo." Accordingly, the jury was presented with evidence and argument that Singer obtained the heroin from someone other than defendant. Nonetheless, the jury found beyond a reasonable doubt that defendant was the source. Defendant has not shown that his counsel's conduct deprived him of a substantial defense or constituted outcome-determinative error.

Defendant argues that his counsel was ineffective for failing to object to the trial court's judicial bias, as demonstrated by the already described exchange and other exchanges throughout his trial. As discussed in the next section of this opinion, the trial court's actions in this case were insufficient to support a claim of judicial bias. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Finally, defendant argues that his attorney provided ineffective assistance because "he and [defendant] agreed that it would be in [defendant's] best interest to join the two cases in one trial for reasons that they had discussed privately." Although the record reveals that defendant and defense counsel discussed the implications of trying the two cases before a single jury, it does not reveal that defense counsel advised defendant that joinder would be in his best interests. At the hearing on the prosecution's motion to join the two cases, defense counsel stated, "Well, naturally I think I've got to place on the record that of course [joinder is] . . . highly prejudicial to my client." Nonetheless, defendant explicitly agreed that he had come to an "independent decision that it's fair that these two cases should be joined; that one jury should hear both of these cases together[.]" Because the record does not reveal what advice defense counsel gave

---

[1] The parties and the trial court agreed that statements Trim made to O'Leary while Singer was overdosing were exited utterances. A statement Trim made to defendant around the same time would also, therefore, have qualified as an exited utterance.

defendant regarding the joinder issue, defendant has failed to establish the factual predicate of his ineffective assistance claim, *Carbin*, 463 Mich at 600, and has not demonstrated any error apparent on the record, *Heft*, 299 Mich App at 80.

What is more, defendant cannot demonstrate that the outcome of the proceeding would have been different if the two cases were not joined. On appeal, defendant argues that he should have been allowed to plead guilty in the controlled-buy case because "[e]ven if evidence of the second transaction were admissible under MRE 404(b),[2] that would not be as prejudicial as actually trying both cases together." Defendant does not dispute that much of the evidence from the controlled-buy case would have been admissible in the delivery-causing-death case for a proper purpose under MRE 404(b)(1). " 'Joinder of . . . other crimes cannot prejudice the defendant more than he would have been by the admissibility of the other evidence in a separate trial.' " *People v Williams*, 483 Mich 226, 237; 769 NW2d 605 (2009), quoting *United States v Harris*, 635 F2d 526, 527 (CA 6, 1980). Accordingly, defendant has not shown that his trial counsel's performance was constitutionally deficient.

## III. JUDICIAL BIAS

Defendant failed to raise a claim of judicial bias in the trial court, so we review this unpreserved issue for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 753; 596 NW2d 130 (1999). A defendant has a constitutional right to a fair and impartial jury trial. *People v Cole*, 349 Mich 175, 200; 84 NW2d 711 (1957). A trial judge's conduct deprives a defendant of a fair trial if it pierces the veil of judicial impartiality. *People v Stevens*, 498 Mich 162, 170; 869 NW2d 233 (2015). Judicial conduct pierces the veil of impartiality if it is reasonably likely that the conduct improperly influenced the jury by creating the appearance of partiality for or against a party under the totality of the circumstances. *Id.* at 171. When evaluating the totality of the circumstances, reviewing courts may consider a variety of factors including, among others, the tone and demeanor of the judge, the scope of conduct in the context of the length and complexity of the trial, the extent to which the conduct was directed at a single party, and the presence of a curative instruction. *Id.* at 172. "Judicial misconduct may come in myriad forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions." *Id.* at 172-173.

---

[2] MRE 404(b)(1) states the following:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system of doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

A defendant must overcome a strong presumption of judicial impartiality when raising a claim of judicial bias. *People v Biddles*, ___ Mich App ___, ___; ___ NW2d ___ (2016) (Docket No. 326140); slip op at 2. "Comments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality." *People v Jackson*, 292 Mich App 583, 598; 808 NW2d 541 (2011). "Moreover, partiality is not established by expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women sometimes display." *People v McIntire*, 232 Mich App 71, 105; 591 NW2d 231 (1998), rev'd on other grounds 461 Mich 147 (1999).

Defendant argues that the trial court demeaned his counsel several times during the trial, which pierced the veil of impartiality under the totality of the circumstances. We disagree. Defendant first points to an instance in which the trial court criticized defense counsel for consulting with defendant about the prosecution's witness list, but this comment occurred outside the presence of the jury and therefore could not have improperly influenced the jurors. *Stevens*, 498 Mich at 171. Defendant next identifies an instance of alleged judicial bias that occurred while defense counsel was questioning O'Leary:

> *Q*. [T]here came a time when you knew that John, the decedent in this case, your boyfriend, consumed Xanax.
>
> *A*. Yeah, on occasion.
>
> *Mr. Stevens* [*The Prosecution*]: Your Honor, I am going to object, because the timeline he is asking is so vague that I don't know.
>
> *The Court*: You got to clarify some—
>
> *Mr. Watson*: I'll be happy to.
>
> *The Court*: A lot of people taking Xanax for heaven's sake.
>
> *Mr. Stevens*: With that I ask that the answer be stricken at this point.
>
> *The Court*: Yeah. You got to connect that up.
>
> *Mr. Watson*: I am happy to, Judge.
>
> *The Court*: Otherwise it's stricken. It's irrelevant what somebody did a year before or six months before or what have you, okay?
>
> *Q*. You told Detective Sandberg in an interview that you knew prior to the 11th of September of 2013, that John was a user or illicit drugs?
>
> *Mr. Stevens*: Your Honor, I am going to object. You just indicated it's irrelevant what other people are doing in past—past time. We are talking about September 11th and 12th. The question clearly asks for something that occurred well beyond that.

*The Court*: Well, Mr. Watson, you got to ask questions that have some relevance to the dates in question.

*Mr. Watson*: Okay.

*The Court*: You can't just go bumbling off into space here.

Defendant does not argue that the trial court erroneously determined that the testimony concerning Singer's prior use of Xanax was irrelevant; rather, he argues that the court's comments reflected poorly on defense counsel. Defendant also points to comments the court made when defense counsel attempted to establish that O'Leary had no personal knowledge of the source of the heroin Singer consumed, which occurred during the following exchange:

> *Q*. Any information that you have that caused you to have any belief that my client sold heroin to John comes from Jesse Trim?
>
> *A*. Yes.
>
> *Q*. Okay. So were you guessing, then, when you were telling the Detectives on September 12th?
>
> *Mr. Stevens*: I guess I am going to object as to vague. Guessing as to what?
>
> *The Court*: Well, I don't know where you are going. You've got to ask something—ask a question. Guessing about the sun? The moon?
>
> *Q*. You were guessing about Jamal being the drug dealer, is that what you are telling us now?
>
> *The Court*: Wait a minute. See, you got—I don't know what you are doing. You got to ask a question that has specifics so that he doesn't have to jump up and down every 30 seconds. Your question is struck.

A trial court may exercise control over the mode and order of interrogating witnesses to "make the interrogation and presentation effective for the ascertainment of the truth . . . ." MRE 611(a). Given the context, it was not improper for the trial court to conclude that defense counsel's questions were vague and the statement, "I don't know what you are doing," did not necessarily reflect poorly on defense counsel.

Defendant next identifies an exchange that occurred after Trim testified that he confronted Singer about lottery tickets he found in a gas station bathroom.

> *Q* [*Mr. Stevens*]. What did he say?
>
> *A*. I do not remember completely, but I remember him talking to me saying that—saying how he was just starting to do good and how he started

getting to me and started telling me this story about how his grandparents found a pill in his shoe.

> *Mr. Watson*:  I guess I have to object to the—that's hearsay.

> *The Court*:  Wait.  Wait.  What are you talking about?  It's an event.

> *Mr. Watson*:  It's a statement made by somebody other than the declarant.

> *The Court*:  Well, it's still an event.  When it is the perception and the event, words can be an event.  How do you ever put any evidence in of what anybody ever says if it has to be the way you say?

> *Mr. Watson*:  If he is talking about the event, that is the event that this moment in time where he is confronting this John—

> *The Court*:  Let me ask you a question.

> *Mr. Watson*:  If I may?

> *The Court*:  Sir.

> *Mr. Watson*:  If he is talking about that I have no objection to that, but what this witness is talking about is an event that he claims another person has said about some other time.

> *The Court*:  That's right.

> *Mr. Watson*:  That's hearsay in my estimation.

> *The Court*:  No, it isn't, sir.  Let me explain to you.  I have been doing this an awful, awful long time.  And a person's perception of what somebody says is not offered for its truth.  It's offered for what was said.  It is an action, just like when you raised that cup is an action.  Your objection is overruled, but thank you.

Defendant argues that counsel's objection was arguably valid and the trial court unnecessarily demeaned defense counsel before the jury rather than simply overruling his objection.  It is not clear from the record why the prosecution asked Trim what Singer said when he confronted him about the lottery tickets, or why Trim relayed Singer's story about how his grandparents found a pill in his shoe.  Under the circumstances, we agree that it was not as clear as the trial court implied that Trim's testimony about Singer's statements was admissible either as non-hearsay or as testimony falling within an exception to the rule excluding hearsay, see MRE 801-803, but an error by the trial court does not establish judicial bias.  See *People v Roscoe*, 303 Mich App 633, 647-648; 846 NW2d 402 (2014).  Furthermore, the court's comments in overruling the objection were not overly demeaning.

Defendant points to an instance in which his counsel asked Trim during cross-examination if he needed to refresh his memory about a statement before Trim testified that he

could not remember the statement. The prosecution objected and the trial court stated, "Mr. Watson, try to stick with the good questions, please." The trial court could have simply sustained plaintiff's objection, but his direction to "stick with the good questions" under the circumstances was not demeaning to the point that reversal is required.

Defendant further notes the trial court's comments when his attorney attempted to impeach Trim about a statement he made to law enforcement about Singer's drug paraphernalia.

> *Q.* I draw your attention to page 9 of 10 of the third line down of that same interview of the 12th of September of 2013. And I quote you, oh, he had a bag of needles, and like, there is a spoon in there, close quote. Did you remove stuff to make sure there was nothing inside of your room?
>
> *The Court*: Mr. Watson? Mr. Watson?
>
> *Mr. Stevems*: That wasn't a question.
>
> *Mr. Watson*: It was an impeachment. He denied making that statement.
>
> *The Court*: I understand, but now you ask him if he made it.
>
> *Q.* Did you make that statement?
>
> *The Court*: Do I have to get the evidence book out and have you study it tonight, sir?
>
> *Mr. Watson*: No, Judge.
>
> *The Court*: You have been doing this a long time.
>
> *Mr. Watson*: Yes, I have.
>
> *The Court*: So please slow down and do it correctly.

Although defendant does not explain why the trial court's comments were improper, and therefore could be said to have abandoned this alleged example of judicial bias, see *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959), we nonetheless note that the statement, "Do I have to get the evidence book out and have you study it tonight, sir?" was obviously somewhat belittling toward defense counsel.

Defendant also points to an instance in which defense counsel stated to a witness, "Gotcha. Thanks for bringing that in. Appreciate that," and the trial court interjected, "Mr. Watson—that comment is stricken from this record. Mr. Watson, if you have something to ask, ask it. If you want to testify, get right up here and I'll swear you in." It was not improper for the court to instruct defense counsel to refrain from making non-inquisitorial comments to a witness, see MRE 611(a), and the judge's comment was not demeaning or belittling.

Defendant points to the following comment by the trial court when defense counsel concluded his questioning of Deputy Lo:

> *Mr. Watson*: Okay. Thank you.
>
> *Mr. Stevens*: Nothing. Thank you.
>
> *The Court*: Well, as long as everybody else is bringing in everything that shouldn't come in, I suppose you could bring in some more, too. No?
>
> *Mr. Stevens*: I am fine. Thank you.

We agree with defendant that the trial court's comment unnecessarily suggested that defense counsel may have been doing something improper.

Defendant points to certain comments that the trial court made, which he argues "implied that the Defendant's sentence would be affected by 'undercurrent' that he was displaying." But these comments were not made before the jury and therefore could not have improperly influenced the jurors. See *Stevens*, 498 Mich at 171.

Defendant argues that the trial court improperly implied that defendant was not credible while he was testifying, given the following exchange with defense counsel:

> *Q* [*Mr. Watson*]. Keep your voice up.
>
> *A* [*Defendant*]. I'm sorry.
>
> *Q*. Okay. This is all being recorded and these people have to listen to what you have to say.
>
> *A*. Can you guys hear me?
>
> *The Court*: Don't be talking directly to the jury.
>
> *The Witness*: I'm sorry. I didn't know that. I didn't know.
>
> *The Court*: Really?

The trial court's comment could be read as expressing disbelief that defendant did not know that he should refrain from talking to the jury. See *Stevens*, 498 Mich at 174 (explaining that it is inappropriate for a judge to express disbelief of a witness). However, the matter was not pertinent to defendant's substantive testimony, and it is unlikely that the off-handed remark affected the jury's determination regarding the defendant's credibility on the essential facts.

Defendant argues that the trial court improperly insinuated during the following exchange that defense counsel did not know the rules of evidence:

> *Q* [*Mr. Watson*]. Is that the time that he said it was his girlfriend's car?

*A [Defendant].* Yeah.

*Q.* That it would be disrespectful to use drugs in her car?

*A.* Yes.

*The Court:* Mr. Watson, are you testifying now?

*Mr. Watson:* No. I'm just asking mild leading questions.

*The Court:* It sounds like you are testifying, sir. That wasn't a question. That was a statement. Ask questions.

This exchange makes clear that the court was not suggesting that defense counsel was unfamiliar with the rules of evidence, but rather that he was running afoul of them. See MRE 611(d) (providing that leading questions should generally not be used during direct examination of a witness). The court's statements were neither improper nor demeaning.

Defendant addresses the exchange between the trial court and defense counsel, discussed earlier in this opinion, regarding defendant's testimony that Trim told him during a phone conversation that Singer wanted to stop at Jamo's house. The trial court was understandably irritated that defense counsel wanted to suspend defendant's testimony so he and defendant could hold a private conference. Moreover, even assuming that the trial court's ruling excluding defendant's testimony was erroneous, this would not independently support a claim of judicial bias. See *Roscoe*, 303 Mich App at 648.

Finally, defendant argues that, at the close of trial, the trial court made several comments outside the presence of the jury that were representative of the hostile tone and demeanor the trial court generally displayed before the jury. Having reviewed the comments, we discern no hostility or bias, but rather a sincere explanation for the court's earlier frustration when defense counsel sought to hold a private conference with defendant while defendant was testifying. Moreover, because the comments were made outside the presence of the jury, they could not have improperly influenced the jurors. See *Stevens*, 498 Mich at 171.

Collectively, the comments identified by defendant were made over the course of a four-day trial, and to the extent some of the trial court's comments could be viewed as demeaning or belittling, we note that the court made similar comments toward the prosecution. The court also instructed the jury that it could "only consider the evidence that was properly admitted" and that the "Court's comments, rulings, questions and instructions are not evidence." The court further instructed the jury, "If you believe that I have an opinion about how you should decide the case, pay no attention to that." We presume that jurors follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). "[A] curative instruction will often ensure a fair trial despite minor or brief inappropriate conduct." *Stevens*, 498 Mich at 177. The trial court's conduct was not so egregious that a curative instruction could not ease any appearance of partiality. *Id.* at 177-178. Considering the totality of the circumstances, it is unlikely that the judge's conduct "improperly influenced the jury by creating the appearance of advocacy or partiality against defendant." *Id.* at 190.

## IV. DOUBLE JEOPARDY

Finally, defendant argues that his convictions in Docket No. 331705 for delivery of a controlled substance causing death, MCL 750.317a, and delivery of less than 50 grams of a controlled substance, MCL 333.7401(2)(a)(*iv*), violated the Double Jeopardy Clauses of the United States and Michigan Constitutions. See US Const, Am V; Const 1963, art 1, § 15. "The prohibition against double jeopardy provides three related protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense." *People v Nutt*, 469 Mich 565, 574; 677 NW2d 1 (2004). Because defendant's convictions in Docket No. 331705 arose "from the same conduct at the same trial, this case involves the multiple punishments strand of double jeopardy." *People v Miller*, 498 Mich 13, 17; 869 NW2d 204 (2015).

"The multiple punishments strand of double jeopardy is designed to ensure that courts confine their sentences to the limits established by the Legislature and therefore acts as a restraint on the prosecutor and the Courts." *Id.* at 17-18 (quotation marks and footnotes omitted). "To determine whether a defendant has been subjected to multiple punishments for the 'same offense,' we must first look to determine whether the Legislature expressed a clear intention that multiple punishments be imposed." *People v Garland*, 286 Mich App 1, 4; 777 NW2d 732 (2009). If the Legislature clearly expressed an intention to impose multiple punishments, imposition of such sentences does not violate the Constitution, even if the offenses share the same elements. *People v Ream*, 481 Mich 223, 228 n 3; 750 NW2d 536 (2008). "Conversely, where the Legislature expresses a clear intention in the plain language of a statute to prohibit multiple punishments, it will be a violation of the multiple punishments strand for a trial court to cumulatively punish a defendant for both offenses in a single trial." *Miller*, 498 Mich at 18.

We discern the Legislature's intent by interpreting the words of a statute based on their ordinary meaning and the context in which they are used. *People v Lowe*, 484 Mich 718, 722-723; 773 NW2d 1 (2009). The controlled substances act, MCL 333.7101 *et seq.*, Article 7 of the Public Health Code, MCL 333.1101 *et seq.*, provides in pertinent part the following:

> (1) Except as authorized by this article, a person shall not manufacture, create, deliver, or possess with intent to manufacture, create, or deliver a controlled substance, a prescription form, or a counterfeit prescription form. . . .

> (2) A person who violates this section as to:

> (a) A controlled substance classified in schedule 1 or 2 that is a narcotic drug or a drug described in section 7214(a)(*iv*) and:

> \* \* \*

> (*iv*) Which is in an amount less than 50 grams, of any mixture containing that substance is guilty of a felony . . . . [MCL 333.7401(1) and (2)(a)(*iv*).]

MCL 750.317a is encompassed by Chapter XLV, "Homicide," of the Michigan Penal Code and provides the following:

A person who delivers a schedule 1 or 2 controlled substance, other than marihuana, to another person in violation of section 7401 of the public health code, 1978 PA 368, MCL 333.7401, that is consumed by that person or any other person and that causes the death of that person or other person is guilty of a felony punishable by imprisonment for life or any term of years.

"When one statute explicitly refers to provisions of another statute, those provisions are applicable and binding as though they had been incorporated and reenacted in the statute under consideration." *Kern*, 288 Mich App at 519-520.

The fact that MCL 750.317a expressly references MCL 333.7401 does not establish that the Legislature intended multiple punishments for those crimes. In *Miller*, 498 Mich at 15, our Supreme Court addressed whether a defendant's convictions for "operating while intoxicated (OWI) and operating while intoxicated causing serious impairment of the body function of another person (OWI-injury) arising from a single intoxicated driving incident" violated the constitutional prohibition against double jeopardy. (Footnotes omitted.) The OWI-injury statute provided that a person, " 'who operates a motor vehicle in violation of subsection (1) [the OWI statute] . . . and by the operation of that motor vehicle causes a serious impairment of a body function of another person is guilty of a crime . . . .' " *Id.* at 20, quoting MCL 257.625(5).

The *Miller* Court determined that the Legislature expressed a clear intent not to impose multiple punishments for simultaneously violating the OWI and the OWI-injury statutes after reviewing MCL 257.625(7)(d), which created "a separate operating while intoxicated offense for individuals who drive while intoxicated with a minor in the car (OWI-minor)." *Miller*, 498 Mich at 23. The OWI-minor statute expressly stated, " 'This subsection does not prohibit a person from being charged with, convicted of, or punished for a violation of subsection (4) or (5) that is committed by the person while violating this subsection.' " *Id.*, quoting MCL 257.625(7)(d) (emphasis omitted). The fact that MCL 257.625(7)(d) specifically authorized multiple punishments led the Court to conclude that the Legislature "did not intend to permit multiple punishments for OWI and OWI-injury offenses arising from the same incident." *Miller*, 498 Mich at 24 (emphasis omitted). The Court reasoned that, "if the Legislature had intended to allow multiple punishments for Subsections (1) and (5), it clearly knew how to do so, as evidenced by the specific authorization in MCL 257.625(7)(d)." *Id.* at 24-25.

The Michigan Penal Code contains numerous subsections specifically authorizing multiple punishments arising from the same conduct.[3] Reading the Michigan Penal Code as a whole, see *People v Feezel*, 486 Mich 184, 205; 783 NW2d 67 (2010), the fact that MCL 750.317a does not expressly authorize multiple punishments could suggest that the Legislature intended to preclude such punishments. However, the Legislature's intent is less clear than in

---

[3] See, e.g., MCL 750.462f(4) ("This section does not prohibit a person from being charged with, convicted of, or punished for any other violation of law arising out of the same transaction as the violation of this section."); MCL 750.216b(2) ("A charge under or a conviction or punishment for a violation of this section does not prevent a person from being charged with, convicted of, or punished for any other violation of law arising from the same transaction.").

*Miller* because none of the specific authorizations in the Michigan Penal Code concern either MCL 750.317a or MCL 333.7401(2)(a)(*iv*). When legislative intent is not clear, Michigan courts apply the "abstract legal elements" test from *Ream*, 481 Mich 223, to determine whether the Legislature intended to classify two offenses as the "same offense" for purposes of double jeopardy. *Miller*, 498 Mich at 19.

> Under the abstract legal elements test, it is not a violation of double jeopardy to convict a defendant of multiple offenses if each of the offenses for which defendant was convicted has an element that the other does not . . . . This means that, under the *Ream* test, two offenses will only be considered the same offense where it is impossible to commit the greater offense without also committing the lesser offense. [*Id.* (quotation marks and footnotes omitted).]

The elements of delivery of less than 50 grams of heroin are "(1) defendant's delivery; (2) of [less than 50 grams]; (3) of heroin or a mixture containing heroin; (4) with knowledge that he was delivering heroin." *People v Collins*, 298 Mich App 458, 462; 828 NW2d 392 (2012) (setting forth the elements for delivery of heroin in an amount between 50 and 540 grams). "Although the amount of the controlled substance is an element of a delivery offense, the defendant's knowledge of the amount is not an element." *Id.* In contrast, the elements of delivery of a controlled substance causing death are (1) a defendant's delivery to another person; (2) of a schedule 1 or 2 controlled substance other than marijuana; (3) with knowledge that he or she was delivering a controlled substance; (4) that the controlled substance was consumed by a person; and (5) that consuming the controlled substance caused the person's death. See MCL 750.317a; M Crim JI 12.2a. There is no requirement under MCL 750.317a to establish the amount of the controlled substance delivered to another person.

The greater offense in this case, MCL 750.317a, clearly contains elements that are not contained in a delivery offense under MCL 333.7401. The lesser offense of delivery of a controlled substance less than 50 grams, MCL 333.7401(2)(a)(*iv*), also contains an element—the amount of the substance—that is not an element of MCL 750.317a. See *People v Mass*, 464 Mich 615, 626; 628 NW2d 540 (2001) (explaining that the amount of a controlled substance is an element of a delivery offense). "Under the abstract legal elements test, it is not a violation of double jeopardy to convict a defendant of multiple offenses if each of the offenses for which defendant was convicted has an element that the other does not . . . ." *Miller*, 498 Mich at 19 (quotation marks and citation omitted). Defendant could be convicted of MCL 750.317a without being convicted of MCL 333.7401(2)(a)(*iv*), depending on the amount of the controlled substance involved. Therefore, defendant's separate convictions for delivery of less than 50 grams of a controlled substance and delivery of a controlled substance causing death do not violate the constitutional protection against double jeopardy.

Affirmed.

/s/ Michael F. Gadola
/s/ Henry William Saad